965 So.2d 108 (2007)
Jesse GUARDADO, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-2035.
Supreme Court of Florida.
June 28, 2007.
Rehearing Denied September 10, 2007.
*110 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Bill McCollum, Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court finding Jesse Guardado guilty of murder in the first degree and imposing a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the convictions and sentences.

Procedural and Factual History
Guardado was indicted on charges of murder in the first degree and robbery with a weapon based on events occurring on or about September 13, 2004, in Walton County, Florida. Guardado pled guilty to both counts on October 19, 2004. Before the penalty phase, Guardado filed several motions that were denied, including a motion to declare Florida's death penalty unconstitutional. On September 12-15, 2005, a penalty phase jury convened and heard evidence in support of aggravating and mitigating factors.
At the time these crimes were committed, Guardado had served time in prison, having been sentenced to twenty years for the crime of robbery with a deadly weapon in Orange County, Florida, and fifteen to twenty years for the crimes of robbery and robbery with a weapon in Seminole County, Florida. The Seminole County sentences ran concurrent with the Orange County sentence. He was placed on conditional release supervision on January 1, 2003, with the conditional release to expire on February 6, 2014.
Guardado had known the victim of the present crimes, 75-year-old Jackie Malone, since 2003, and had rented places to live from her. Guardado had been a guest in her home, including a few overnight stays when he was between rentals. He received assistance from Ms. Malone on numerous occasions including financial assistance, and she had assisted him in getting the job with the local water treatment plant which he held at the time of the crime. Guardado knew certain things about Ms. Malone, including the fact that she kept some money on hand in her wallet.
On the day in question, September 13, 2004, Guardado wanted to get high and continue his recent crack cocaine binge. Desperate for money to fix his truck and obtain drugs, Guardado decided to rob a local grocery store. His attempted robbery with a knife was thwarted by one of the employees. Still desperate for money, Guardado decided to rob and murder Ms. Malone that night because she lived in a secluded area and because she would open her home to him based on their prior trusting relationship.
Guardado arranged to drive his girlfriend's vehicle to work for the night shift. He generally maintained a change of clothes in his girlfriend's car because of the nature of his work at the treatment plant. On this occasion he made sure there were clothes in the car because a *111 hurricane was due to make landfall in a few days. In addition to leaving clothes in the car, Guardado armed himself with a metal "breaker bar." He next drove to the parking lot at the Wal-Mart in DeFuniak Springs, where he got a kitchen knife from his disabled truck that was parked there. With both weapons in his possession, he then drove his girlfriend's car to Ms. Malone's house.
Ms. Malone had already retired for the night so Guardado continually knocked on her door to awaken her. Guardado identified himself by name when she came to the door. She greeted Guardado, and he told her he needed to use the telephone. When she turned away to allow him to enter the house, he pulled the "breaker bar," which was hidden behind his back in his pants, and struck her repeatedly about her head. Ms. Malone raised her hands in defense, and then fell to the living room floor. Ms. Malone did not die from the numerous blows with the "breaker bar," so Guardado pulled the kitchen knife and stabbed her several times, then slashed her throat.
Guardado said he hit her on the head with the "breaker bar" and thought that would have killed her, but it did not, so he hit her several more times. He also said that when she fell on the floor behind the couch it seemed she was not going to die so he stabbed her with the knife, including to the heart, so it would be over. However, Guardado confessed, "It just seemed not to go that way, she would not die." After beating and stabbing Ms. Malone, Guardado went to her bedroom, looked through her belongings for money and valuables, and took her jewelry box, briefcase, purse, and cell phone.
Dr. Minyard, a forensic pathologist and Chief Medical Examiner for Walton County, testified concerning the cause of death and her review of the autopsy report and photographs. Dr. Minyard testified that Ms. Malone suffered several injuries including (1) at least twelve abrasions, contusions, and lacerations of the skin on the head, neck and face, (2) bruising under the surface of the scalp, (3) a subarachnoid hemorrhage, (4) at least two incised wounds on the neck, (5) five stab wounds to the chest, (6) a fracture of the finger, and (7) incised wounds to the right hand. The evidence further revealed Ms. Malone was conscious at least through the time that Guardado inflicted the stab wound to her heart. Dr. Minyard said the fracture and wounds to Ms. Malone's hands were consistent with the victim attempting to fend off repeated blows from the breaker bar and her attacker, by reaching or grabbing for the knife.
On September 15, 2005, the jury returned a unanimous recommendation that Guardado be sentenced to death. After the jury's advisory sentence, Guardado waived a Spencer[1] hearing, and the trial court found his waiver to be voluntary. The trial court stressed however, that Guardado would be offered another opportunity to present additional mitigation before sentencing. The trial court set final sentencing for September 30, 2005, and requested sentencing memoranda from the State and Guardado. The State requested a Spencer hearing despite Guardado's waiver of such a hearing. On September 30, 2005, over Guardado's continued assertion of waiver, the trial court held a Spencer hearing, received additional mitigation evidence, and set final sentencing for October 13, 2005.
On October 13, 2005, based on the evidence presented at the penalty phase proceeding and the Spencer hearing, the trial court sentenced Guardado to death for the *112 first-degree murder of Ms. Malone. On the count of robbery with a weapon, Guardado was sentenced to thirty years' imprisonment with the sentence to run consecutive to the murder count.
The trial court made detailed findings on the aggravating and mitigating factors. The court found five aggravating factors: (1) the capital felony was committed by a person under sentence of imprisonment or on conditional release supervision; (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (to wit: armed robbery, April 9, 1984; robbery with a deadly weapon, July 6, 1990; robbery, January 23, 1991; robbery with a weapon, January 23, 1991; attempted robbery with a deadly weapon, February 17, 2005); (3) the capital felony was committed while the defendant was engaged in the commission of, or attempt to commit, or escape after committing, a robbery with a weapon; (4) the capital felony was especially heinous, atrocious, or cruel (HAC); and (5) the crime was committed in a cold, calculated and premeditated manner (CCP).
Guardado did not ask the trial court to consider any statutory mitigating circumstances, and the trial court did not find any. The trial court did find nineteen nonstatutory mitigating factors (ten as requested by Guardado, seven additional ones based upon review and consideration of the defense expert at the Spencer hearing, and two that were suggested by the State).[2] The trial court gave the jury's advisory sentence and recommendation great weight and considered and weighed the aggravating and mitigating circumstances. *113 The trial court found, as did the jury, that the aggravating circumstances outweighed the mitigating circumstances. Guardado raises four issues on this direct appeal, which we address below.

Discussion of Issues

NELSON INQUIRY
Guardado argues the trial court erred by failing to comply with the requirements outlined in Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), when he expressly asked the court to remove his court-appointed counsel. Guardado maintains that his continued request to discharge counsel was a request to represent himself and that the trial court's denial violated his right of self-representation. The State asserts most of Guardado's complaints were generalized complaints about counsel and did not require a Nelson inquiry, and that other complaints about counsel were meritless as a matter of law, and thus they were properly denied. Additionally, the State argues Guardado never asked to represent himself.
Guardado's history of self-representation and representation by counsel is a convoluted one. It is clear, however, that the only issue before this Court is whether or not Guardado should have been allowed to represent himself at the Spencer hearing. Guardado was allowed, after proper inquiry by the trial court, to represent himself at the plea hearing. After the guilt phase proceedings were concluded, Guardado, at his own request, was represented by counsel during the presentation of evidence at the penalty phase. We find under the circumstances presented here that the trial court did not err in its ruling on the complaints made by Guardado concerning counsel at the Spencer hearing.
A trial court's decision involving withdrawal or discharge of counsel is subject to review for abuse of discretion. See Weaver v. State, 894 So.2d 178, 187 (Fla. 2004). Where a defendant seeks to discharge his lawyer on grounds of ineffective assistance, the trial court is required to make a series of inquiries. See Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988) (quoting Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973)). However, any inquiry by the trial court can only be as specific as the complaints made by the defendant. When the defendant makes generalized complaints about counsel, the trial court need not make a Nelson inquiry. See Morrison v. State, 818 So.2d 432, 441 (Fla.2002); Sexton v. State, 775 So.2d 923, 930-31 (Fla.2000); Gudinas v. State, 693 So.2d 953, 962 n. 12 (Fla.1997).
At the plea hearing, the trial court asked Guardado about appointment of an attorney for the penalty phase. Guardado stated he did not want counsel appointed. At this point Guardado entered his plea of guilty, and the trial court accepted the plea. A date for the penalty phase was set, and the trial court told Guardado that if he changed his mind about the appointment of counsel at any time before the penalty phase, the court would consider any request. Ultimately, counsel was appointed and the penalty phase occurred as scheduled.[3] There was no request by Guardado to discharge appointed counsel prior to the completion of evidence at the penalty phase proceeding.
Guardado testified at the penalty phase, after which the court made certain inquiries directly to the defendant in regards to whether there was any other evidence he *114 knew of at that time that he would like to present. Guardado was hesitant about answering before speaking with his attorneys. After Guardado conferred with counsel, the trial court again inquired if there was any other mitigation evidence he would like to present. Guardado informed the trial court that he had no other evidence.
After the jury recommendation, the trial court discussed the Spencer hearing and the consideration of any further mitigation evidence. Guardado's counsel advised the court that Guardado was waiving the Spencer hearing and wanted to proceed straight to sentencing. The trial court inquired of Guardado and found his decision to waiver the hearing was done knowingly, voluntarily, and intelligently. The trial court set sentencing for September 30, 2005, and requested sentencing memoranda from the parties.
However, after receipt of the sentencing memoranda and the State's request for a Spencer hearing, the trial court held a Spencer hearing on September 30, 2005. Guardado's counsel again reiterated Guardado's desire not to have a Spencer hearing and his wish to proceed to sentencing. The trial court again inquired of Guardado under oath concerning other mitigation evidence, to which he responded, "I have no knowledge of any further mitigation that I can present." The proceeding continued and the trial court asked the defendant if he was in fact instructing his attorneys not to present any further mitigation on his behalf. In response to the trial court's inquiry Guardado began his complaints about penalty phase counsel. Guardado told the trial court that counsel spent less than an hour in actual conference with him before the trial. He constantly asked his attorney for information about the case and did not receive anything. Guardado also stated that when the trial court ruled on his motions, he asked counsel when he would see him again because he needed to speak with him and counsel said he would see him on Monday, the day of trial. Guardado said he had someone call to say he no longer wished counsel to represent him. However, his mother was distraught about this decision so he allowed counsel to proceed against his (Guardado's) better judgment. In essence, Guardado generally did not like his counsel's performance. Guardado also made general complaints about the evidence that counsel presented and about counsel's failure to object to other evidence. In the final analysis, Guardado was complaining that he wanted to be sentenced on that day, that he did not want a Spencer hearing, and that his case was not proceeding in an expeditious manner.
In Morrison v. State, 818 So.2d 432, 440 (Fla.2002), this Court cited to Hardwick and the procedure to be followed when a defendant complains that his counsel is incompetent. We noted that "the trial judge is required to make a sufficient inquiry of the defendant to determine whether or not appointed counsel is rendering effective assistance to the defendant." Morrison, 818 So.2d at 440 (citing Howell v. State, 707 So.2d 674, 680 (Fla. 1998)). However, "as a practical matter, the trial judge's inquiry can only be as specific as the defendant's complaint." Id. (citing Lowe v. State, 650 So.2d 969 (Fla. 1994)). We found in Morrison that although Morrison made several requests to replace counsel, the claims "centered principally around Morrison's dissatisfaction with the amount of communication between him and counsel." Id. at 441. Furthermore, we noted, "[a] lack of communication, however, is not a ground for an incompetency claim." Id. Additionally, Morrison "expressed displeasure with counsel's refusal to provide copies of legal documents and efforts in contacting witnesses." *115 Id. We found Morrison was not entitled to a Nelson hearing because "[t]hese complaints can best be described as general complaints about his attorney's trial preparation." Id.
The record reflects Guardado made several general complaints that did not warrant a Nelson/Hardwick hearing. Guardado complained that counsel did not spend a lot of time with him and that he did not receive information about his case. This type of general complaint does not rise to the requisite level to warrant a Nelson/Hardwick hearing. In Sexton v. State, 775 So.2d 923, 931 (Fla.2000), we found defendant's statement asking for a delay of trial until he could obtain attorneys he could have confidence in merely expressed general dissatisfaction with the trial preparation of his lawyer. We found it was not a sufficient basis to support a contention that his attorney was incompetent. Similarly, in Gudinas v. State, 693 So.2d 953, 961-62 (Fla.1997), the defendant objected to his exclusion from an in-chambers discussion between the attorneys and the trial judge. We found defendant never specifically claimed defense counsel was acting in a legally incompetent manner and thus was essentially making a general complaint about trial strategy, a complaint that did not require a Nelson inquiry. Pursuant to Morrison, Sexton, and Gudinas, a Nelson inquiry is not required where defendant states generalized grievances.
In this case, the record supports the conclusion that the trial court did not abuse its discretion in its handling of Guardado's complaints about counsel. His complaints about counsel occurred at the Spencer hearing, a hearing that he had attempted to waive. Apparently disgruntled by the lack of expediency he desired, Guardado complained that he was "shown a great indifference" by counsel, which is the type of general grievance that does not require a Nelson hearing. Under the circumstances of this case, Guardado's complaints in total are analogous to a lack of confidence in and dissatisfaction with counsel's trial strategies and a request for sentencing on that day, complaints which do not require a Nelson hearing. Therefore, the trial court did not abuse its discretion in not conducting a Nelson hearing.

AGGRAVATORS

Heinous, Atrocious, or Cruel Aggravator
Guardado argues that the evidence was insufficient to establish the heinous, atrocious or cruel (HAC) aggravating circumstance and that the trial court erred when it instructed the jury it could consider the HAC circumstance based on these facts. Conversely, the State asserts there is competent, substantial evidence to support the trial court and jury's consideration and finding of HAC. We agree with the State, and affirm the trial court's determination that HAC is applicable to this case.
The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence. See England v. State, 940 So.2d 389, 403 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1916, 167 L.Ed.2d 571 (2007). This Court has found competent, substantial evidence to support the HAC aggravator in a number of cases involving brutal beatings. See Dennis v. State, 817 So.2d 741, 766 (Fla.2002) (HAC affirmed where both victims suffered skull fractures and were conscious for at least part of the attack as they had defensive wounds to their hands and forearms); Bogle v. State, 655 So.2d 1103, 1109 (Fla.1995) (HAC affirmed where victim was struck seven times on the head, victim was alive during infliction of most of the wounds, *116 and the last blows caused death); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986) (HAC affirmed where victim was brutally beaten while attempting to fend off the blows before being fatally shot). We have also upheld the HAC aggravator in cases where the victim has been repeatedly stabbed. See Owen v. State, 862 So.2d 687, 698 (Fla.2003) (citing Cox v. State, 819 So.2d 705, 720 (Fla.2002)); Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998) (affirming the HAC aggravator where the victim was stabbed or cut eighteen times and was alive when all the wounds were inflicted).
In this case the trial court found the capital felony was especially heinous, atrocious, or cruel pursuant to section 921.141(5)(h), Florida Statutes (2004). The trial court said:
[T]his murder was indeed a conscienceless, pitiless crime, which was unnecessarily torturous to the victim. The evidence establishes beyond a reasonable doubt that the defendant administered a savage attack on Ms. Malone first by repeated blows about her head and limbs with a metal bar, which she tried to fend off and sustained a finger fracture; that the defendant observed Ms. Malone still alive and lying on the floor despite that flurry of blows; that the defendant then mindful of his previous prison job slaughtering cattle, took out a kitchen knife that he brought with him and twice slashed Ms. Malone's throat and stabbed her (including the fatal stab to her heart) while she grabbed for the knife further trying to fend off or fight her attacker. The defendant admitted the facts concerning the crime.
The record supports this determination.
Guardado confessed that he killed the victim. The autopsy revealed the victim was beaten about the head several times, stabbed repeatedly (including a mortal wound to the heart), and her throat slashed. Specifically, the medical examiner testified the victim had "multiple abrasions, contusions and lacerations of head and face." There were twelve lacerations to the head, five stab wounds to the chest and two incise wounds to the neck. The examiner also testified there were incise wounds to the victim's right hand, the type that happens when "the victim tries to grab the assailant's weapon and in so doing, is cut with the sharp blade." The medical examiner said she believed the victim was conscious during the attack because "she does have the defense wounds on her hands," indicative she was "still conscious enough to try to grab the assailant's weapon." This evidence supports the trial courts finding of HAC.
Contrary to Guardado's assertions, the victim did not lose consciousness quickly after the initial blows to her head. The defensive wounds are indicative of consciousness up to the time of the fatal stab wound to the heart. Under similar circumstances, we have affirmed findings of HAC where defensive wounds revealed awareness of impending death. See, e.g., Boyd v. State, 910 So.2d 167, 191 (Fla. 2005) (finding of HAC affirmed where victim was repeatedly stabbed and evidence revealed victim was alive and conscious for some of the attack and was struggling with her attacker). More recently in Reynolds v. State, 934 So.2d 1128, 1156 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 943, 166 L.Ed.2d 721 (2007), we noted with approval the fact that the medical examiner's testimony established the victims had defensive wounds indicating consciousness during some part of the attack. Furthermore, "we have upheld the application of HAC even where `the medical examiner determined the victim was conscious for merely seconds.'" Id. (quoting Francis v. State, 808 So.2d 110, 135 (Fla.2001)).
*117 The trial court properly found HAC under the facts of this case, and the trial court properly instructed the jury on this aggravating circumstance.

Cold, Calculated and Premeditated
Guardado next argues the evidence was insufficient to establish the cold, calculated and premeditated (CCP) aggravator and that the trial court erroneously instructed the jury it could consider the CCP aggravator under these facts. Conversely, the State asserts there is competent, substantial evidence to support the trial court's finding of CCP. This Court has noted that to support the CCP aggravator, a jury must find (1) that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic or a fit of rage (cold); (2) that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); (3) that the defendant exhibited heightened premeditation; and (4) that the defendant had no pretense of moral or legal justification. See Buzia v. State, 926 So.2d 1203, 1214 (Fla.) (citing Jackson v. State, 648 So.2d 85, 89 (Fla.1994)), cert. denied, ___ U.S. ___, 127 S.Ct. 184, 166 L.Ed.2d 129 (2006).
In this case, the CCP aggravator was proven beyond a reasonable doubt. The evidence reveals Guardado was desperate for money for drugs and to fix his vehicle. He first attempted to rob a local grocery store. When that robbery was thwarted by the victim, Guardado arranged to drive his girlfriend's vehicle to work for the night shift. Guardado knew he had a change of work clothes in the car because of the nature of his work at the water treatment plant and because a hurricane was expected to strike the area in the near future. Guardado told the police that he chose Ms. Malone to murder and rob that night because of the "secluded location of her home," and because she would open her home to him (even at night) due to their prior relationship. Before going to Ms. Malone's house, Guardado armed himself with the kitchen knife and a "breaker bar" to use as the murder weapons. Guardado said in his confession that "he knew what he was going to do when he drove to the victim's home." When he was asked if he planned to kill Ms. Malone he responded, "Yes, and get the money." These facts clearly show that the murder was the result of cool and calm reflection, with a careful plan, with the purpose of robbing the victim of her money so that the defendant could get high on drugs and fix his vehicle.
Contrary to Guardado's assertions that his drug use negates CCP, we have concluded that a chronic drug abuser can act "acted according to a deliberate plan," where the evidence shows he "was fully cognizant of his actions on the night of the murder." Robinson v. State, 761 So.2d 269, 278 (Fla.1999). In Robinson, the victim was beaten and then stabbed by a chronic drug abuser. Similarly to this case, Robinson confessed he stole the victim's property to pawn for money to purchase drugs. See Robinson, 761 So.2d at 271. The trial court found the CCP aggravator, and we affirmed without discussion. In this case, there is likewise no evidence to support a conclusion that Guardado's drug use robbed him of the ability to plan and execute this murder. We therefore affirm the trial court's determination that the CCP aggravator is applicable to this situation.

Ring Issue
Guardado argues the trial court erred in denying his motion to dismiss because the death penalty statute is unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Guardado asks this Court to reconsider its *118 position in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002) and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), because Ring represents a major change in the law. The State argues that this Court has repeatedly rejected Ring claims and that Guardado is asking this Court to reconsider Bottoson and King in general and not based on the specifics of his case. The State maintains there was no violation of Guardado's Sixth Amendment right to a jury trial because he pled guilty to the charges, and Guardado had a jury in the penalty phase that unanimously recommended death. We deny relief based on precedent from this Court and based on the fact that one of the aggravating circumstances found in this case is a prior violent felony.
In numerous cases that have been decided since the Ring decision, this Court has rejected similar arguments that Florida's death penalty statute is unconstitutional based on Ring. See Marshall v. Crosby, 911 So.2d 1129, 1134 n. 5 (Fla.2005). In addition, this Court has repeatedly found that the prior violent felony aggravator takes a case outside the scope of Ring. See Marshall, 911 So.2d at 1135 & n. 6; see also Smith v. State, 866 So.2d 51, 68 (Fla. 2004) (denying relief on a Ring claim and noting that one of the aggravating factors present in the case was a prior violent felony); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (finding that the existence of a prior violent felony conviction satisfies the constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt).
Guardado is not entitled to relief based on the Ring decision.

Sufficiency of the Evidence
Guardado has not raised sufficiency of the evidence to support his conviction in this case. However, the State asserts this case is an exception because Guardado waived any claim based on the sufficiency of the evidence by entering a guilty plea and stipulating to the factual basis. Notably, this Court has held that although a defendant has not challenged the sufficiency of the evidence to support the murder conviction, "we have the independent duty to review the record in each death penalty case to determine whether competent, substantial evidence supports the murder conviction." Buzia v. State, 926 So.2d 1203, 1217 (Fla.2006). Moreover, "`[w]hen a defendant has pled guilty to the charges resulting in a penalty of death, this Court's review shifts to the knowing, intelligent, and voluntary nature of that plea.'" Tanzi v. State, 964 So.2d 106, 121 (Fla.2007) (quoting Winkles v. State, 894 So.2d 842, 847 (Fla.2005)).
The record reflects Guardado pled guilty to the charges and elected to waive the reading of the factual basis for each charge. However, the State read the factual basis for the charges from the indictment and Guardado did not object to any of the facts. Additionally, during the plea colloquy, Guardado expressed an understanding of the plea and the possibility that he could be given the death penalty. Furthermore, Guardado testified at the penalty phase regarding his crimes and essentially admitted his guilt. Accordingly, there is competent, substantial evidence in the record supporting Guardado's conviction for first-degree murder.

Proportionality
Although Guardado has not raised this issue, this Court "conducts a review of each death sentence for proportionality, regardless of whether the issue is raised on appeal." England v. State, 940 So.2d 389, 407 (Fla.2006); see also Fla. *119 R.App. P. 9.142(a)(6).[4] In deciding whether a death sentence is proportionate, this Court must consider the totality of the circumstances and compare the case with other similar capital cases. See Sexton v. State, 775 So.2d 923, 935 (Fla.2000). This analysis "is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Instead, this Court must look to the nature of and the weight given to the aggravating and mitigating circumstances. For purposes of proportionality review, this Court accepts the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence. See Bates v. State, 750 So.2d 6, 12 (Fla.1999).
In this case, the trial court gave the jury's advisory sentence and recommendation great weight. The trial court found five aggravators, including prior violent felony, HAC and CCP; no statutory mitigators; and nineteen nonstatutory mitigators, including the entry of plea, cooperation with the authorities, a good jail record, addiction to cocaine, could counsel other inmates about making better choices, and remorse. The trial court and the jury found the aggravating circumstances outweighed the mitigating circumstances. This Court has found death to be the appropriate penalty in other cases involving similar aggravating and mitigating circumstances. See e.g., Duest v. State, 855 So.2d 33 (Fla.2003) (finding death sentence proportionate where victim was stabbed multiple times and the trial court found several aggravators including prior violent felony and HAC, no statutory mitigators and twelve nonstatutory mitigators, including a history of drug and alcohol abuse, willingness and ability for rehabilitation, lack of intent to kill, and a physically and mentally abusive childhood); Morrison v. State, 818 So.2d 432 (Fla.2002) (finding death sentence proportionate where the victim was stabbed several times and the trial court found several aggravators including prior violent felony and HAC; no statutory mitigators; and eight nonstatutory mitigators, including good jail conduct, cooperation with the police, alcohol and cocaine abuse, and only borderline intellectual ability).
This Court found the death penalty proportionate in a recent case where similar aggravators and two statutory mitigators were found. See Buzia v. State, 926 So.2d 1203 (Fla.2006) (finding death sentence proportionate where the victim was beaten and the trial court found several aggravators including prior violent felony, HAC, and CCP plus two statutory mitigators and seven nonstatutory mitigators). In Buzia we said both the HAC and CCP aggravators are "two of the most serious aggravators set out in the statutory sentencing scheme." Buzia, 926 So.2d at 1216 (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)). Both of these serious aggravators are applicable in this case.
In sum, we find the factual circumstances and the nature and weight given to the aggravating and mitigating circumstances in this case demonstrate that the sentence of death is proportional to other murder cases involving similar factual circumstances and similar aggravating and mitigating circumstances.

*120 Conclusion
For all of the reasons expressed above, we affirm the judgments and sentences, including the sentence of death imposed by the trial court.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., recused.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The nonstatutory mitigating factors and the weight given by the trial court are: (1) defendant entered a plea of guilty to first-degree murder without asking for any plea bargain or other favor in exchange (great weight); (2) defendant has fully accepted responsibility for his actions and blames nobody else for this crime (great weight); (3) defendant is not a psychopath pursuant to expert testimony and would not be a danger to other inmates or correctional officers should he be given a life sentence (moderate weight); (4) defendant could contribute to an open prison population and work as a plumber or an expert in wastewater treatment plant operations should he be given a life sentence (little weight); (5) defendant fully cooperated with law enforcement to quickly resolve the case to the point of helping law enforcement officers recover evidence to be used against him at trial (great weight); (6) defendant has a good jail record while awaiting trial with not a single incident or discipline report (little weight); (7) defendant has consistently shown a great deal of remorse for his actions (great weight); (8) defendant has suffered most of his adult life with an addiction problem to crack cocaine which was the basis of his criminal actions (some weight); (9) defendant has a good family and a good family support system that could help him contribute to an open prison population (moderate weight); (10) defendant testified he would try to counsel other inmates to take different paths than he has taken should he be given a life sentence (moderate weight); (11) as a child, defendant suffered a major trauma in his life by the crib death of a sibling (moderate weight); (12) as a child, defendant suffered another major trauma in his life by being sexually molested by a neighbor (moderate weight); (13) defendant has a lengthy history of substance abuse (marijuana and Quaaludes) during early teen years, graduating to alcohol and cocaine and substance abuse treatment beginning about age 14 or 15 (little weight); (14) defendant's biological father passed away before defendant developed any lasting memories of him (little weight); (15) defendant was raised by his mother, whom he always considered loving, thoughtful and concerned, and by a stepfather he later came to respect (little weight); (16) defendant was under emotional duress during the time frame of this crime (little weight); (17) defendant does not suffer a mental illness or major emotional disorder (little weight); (18) defendant offered to release his personal property, including his truck, to his girlfriend (little weight); and (19) defendant previously contributed to state prison facilities as a plumber and in wastewater treatment work (little weight).
[3] The record does not clearly reflect under what circumstances or why Guardado changed his mind about representation at the penalty phase. At best the record indicates that Guardado's family wanted him to have counsel and that he acquiesced to their desires.
[4] Rule 9.142(a)(6) is entitled "Scope of Review" and reads as follows: "In death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."