PER CURIAM.
William Kenneth Taylor appeals the denial of his postconviction motion to vacate his convictions and sentences filed under Florida Rule of Criminal Procedure 3.851. Taylor’s convictions included a conviction of first-degree murder for which the trial court imposed a sentence of death. Taylor also petitions this Court for a writ of habe-as corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the rea *754 sons provided below, we affirm the denial of Taylor’s rule 3.851 motion and deny his petition for a writ of habeas corpus.

Trial Court Proceedings

A jury convicted Taylor of first-degree murder and robbery with a firearm in connection with the death of Sandra Kushmer, attempted first-degree murder and robbery with a deadly weapon as to William Maddox, and armed burglary of a dwelling. See Taylor v. State, 937 So.2d 590, 596 (Fla.2006). The jury recommended death by a vote of twelve to zero. See id. at 597. The trial court followed the recommendation of the jury and sentenced Taylor to death for the murder of Ms. Kushmer. See id. On direct appeal, this Court detailed the following facts with regard to the crimes committed by Taylor:
At trial, Renata Sikes established that on Friday, May 25, 2001, she, along with her daughter Sandra Kushmer and her son William Maddox, went to visit her husband in the hospital. Kushmer and Maddox left the hospital in a rental car. At approximately 10:30 p.m. that night, Sikes called her home and spoke to Kushmer, who advised that “Ken” was there with Kushmer and Maddox, and, according to Sikes, it sounded as though she was having fun. Thirty minutes later, Sikes again called home to inform her children that she would remain at the hospital, but there was no answer. Sikes called her home repeatedly thereafter, but the calls were never answered. At approximately 3:30 p.m. on Saturday, May 26, 2001, Sikes returned home. Upon arriving, Sikes noticed that the rental car was gone, and she observed blood on the outside of her house. In addition, Sikes discovered her daughter’s medication, purse, and shoes lying outside on the ground. Upon entering the house, Sikes found Kushmer lying in a puddle of blood. As Sikes walked further into the house, she discovex-ed Maddox lying on the bed in a back bedroom. Sikes observed that Maddox’s face was black and blue, his pillow black with blood, but he was still alive. Sikes later determined that cameras belonging to her husband which had been stored in the closet of Maddox’s room were missing.
Cynthia Byrnes was working at Harry’s Country Bar on the night of Friday, May 25, 2001, the night of these events. She saw Kushmer and Maddox enter the bar that night, while Taylor was also present. According to Byrnes, Maddox was drinking the most expensive liquor sold at the bar, paying for his drinks with twenty-dollar bills, and leaving good tips. Byrnes testified that Maddox, Kushmer, and Taylor left the bar together.
On Saturday, May 26, 2001, Tommy Riley awoke to see Taylor on his doorstep. Later that morning, Taylor asked Riley to cash a $580 check, but Riley refused. The name on the two-party check was William Maddox, and it was from a bank in California, where Maddox lived. Later that evening, Taylor was in a bar where Riley worked as a bartender, paying for drinks with twenty-dollar bills. The following morning, Sunday, May 27, 2001, Riley was advised by an employee at Harry’s Bar, where Taylor, Kushmer, and Maddox had been the night of the murder, that detectives were looking for Taylor. Riley conveyed this information to Taylor, and he immediately left Riley’s house in his pickup truck.
The detective in charge of investigating these crimes obtained information that Maddox’s credit cards had been used in Tampa, Florida; Valdosta, Georgia; and Memphis, Tennessee. Based on this information, she contacted the *755 United States Marshal’s Office in Tampa, which then relayed the information to the Marshal’s Office in Tennessee. Deputy Marshal Scott Sanders of the Memphis office received the information on May 29, 2001, from the Tampa office that two warrants for Taylor’s arrest for federal probation violations were outstanding and that Taylor might be in the Memphis area because he was believed to be in possession of credit cards that were being used in that location.
The Tennessee marshals located Taylor’s pickup truck at a motel, and he was taken into custody. Sanders wanted to search Taylor’s motel room at that time but he was unable to do so because he could not locate a Marshal’s Office consent form. He then obtained a consent form from the Shelby County Sheriffs Office, added the words “and the U.S. Marshals Office” to the top of the form, and filled it out, writing in the motel name and the room number to be searched. Sanders explained the form to Taylor and told him the consent form was for his motel room. According to Sanders, Taylor did not express any hesitation in signing the form.
The search of Taylor’s room revealed a checkbook wallet containing checks in the name of Bill Maddox, three credit cards issued to Maddox, credit card receipts, a ticket from a pawn shop in Memphis, a Discover credit card issued to Sandra Kushmer, and a Texaco card issued to Barry Sikes, which Renate [sic] Sikes testified she had given to Kushmer. Receipts dated May 29, 2001, indicated that the Maddox credit card had been used to purchase a gold chain and a wedding band. The pawn shop ticket with the same date indicated that Taylor had pawned the two items.
[[Image here]]
... [T]he lead Florida detective searched Taylor’s truck and found a black bag on the floorboard which contained cameras and camera accessories. The detective presented these items to Sikes, who identified them as belonging to her husband. The detective then went to a bar in Memphis at which Taylor had used the Maddox credit cards and spoke with Pamela Williams, who disclosed that Taylor had purchased drinks for her at the bar on the night of May 28, 2001, and introduced himself to her as William Maddox. She also showed the detective a note given to her by Taylor which he signed as “Bill Maddox” and identified himself as the owner of his own financial corporation.
After speaking with Williams, the detective returned to interview Taylor again. When Taylor was advised by the detective that she did not believe everything he had related the day before, Taylor told her the interview was over. However, Taylor continued to speak, and at one point, he said, “I shot her.”
[[Image here]]
The medical examiner, Dr. Lee Miller, testified that the cause of Kushmer’s death was a shotgun wound to the head that penetrated her arteries and veins, which caused her to bleed to death. Based on the available evidence, at the time of the shooting the shotgun had been pressed against Kushmer’s mouth. The wound path was consistent with Kushmer having been in a sitting position .... Additionally, the laceration on the back of Kushmer’s head was consistent with being struck by the butt of a shotgun.
A blood spatter expert opined that the blood smears on the outside wall of the Sikes home were likely caused by Kush-mer’s bloody hair. Further, high-veloci *756 ty blood spatter located to the left of the smears indicated that the spatter was caused by a gunshot wound. The impact site was consistent with a victim who had been shot in the mouth while sitting or kneeling at the time. The blood patterns inside the Sikes home were consistent with Kushmer’s body having been carried into the home and swung in an arc-like manner before being dropped on the floor.
Latent fingerprints were lifted from beer bottles found in the garbage at the scene. A fingerprint expert matched one latent fingerprint with the known print of Taylor’s right index finger. The Hillsborough County Sheriffs Office collected the shotgun and the pawn ticket from the shop where Taylor had pawned the item. A different fingerprint examiner was of the opinion that a thumbprint on the pawn ticket from the shotgun transaction also matched the known fingerprints of Taylor. The Florida Department of Law Enforcement tested the shotgun, and two areas tested positive for blood. DNA testing on the blood from these two areas generated partial DNA profiles that matched the profile of Maddox at three and four genetic points.
After hearing the evidence, the jury rendered a verdict finding Taylor guilty of first-degree murder as to the death of Kushmer, attempted first-degree murder as to William Maddox, robbery with a deadly weapon as to Maddox, robbery with a firearm as to Kushmer, and armed burglary of a dwelling.
See Taylor, 937 So.2d at 592-96 (footnote omitted).
During the penalty phase, the trial court sentenced Taylor to death for the murder of Kushmer. See id,., 937 So.2d at 597. In rendering Taylor’s sentence, the trial court determined that the State had proven the existence of three statutory aggravators: (1) the murder was committed while Taylor was on felony probation, see § 921.141(5)(a), Fla. Stat. (2001); (2) Taylor had previously been convicted of a felony involving a threat of violence to the person, see § 921.141(5)(b), Fla. Stat. (2001); and (3) the murder was committed for pecuniary gain, see § 921.141(5)(f), Fla. Stat. (2001). See Taylor, 937 So.2d at 597. The trial court assigned each of these factors great weight. The court did not find any statutory mitigators, but found a total of thirteen nonstatutory mitigating circumstances: (1) Taylor was under some mental or emotional disturbance at the time of the crime (some weight); (2) psychological trauma due to abuse and neglect in formative years (some weight); (3) psychological trauma due to deprivation in parental nurturing (some weight); (4) stepfather provided no emotional or parental support (modest weight); (5) neurological impairments affecting ability to control impulses (some weight); (6) learning disabilities, attention deficit problems, and problems with social interactions (some weight); (7) obtained GED in prison (minimum weight); (8) attempts to address and recover from drug dependence (modest weight); (9) good worker and dependable employee (minimum weight); (10) agreed to be interviewed and cooperated with the police (minimum weight); (11) history of substance abuse dating back to pre-teen years (some weight); (12) under the influence of alcohol at time of crime (little weight); and (13) appropriate conduct during trial (little weight). See id. at 597 n. 3.
On direct appeal, this Court affirmed Taylor’s convictions and sentences. See id. at 592.

Postconviction Proceedings

On October 9, 2006, Taylor, pursuant to rule 3.851, filed a motion to vacate and set aside his convictions and sentences. That *757 motion was subsequently supplanted by an amended motion to vacate. The claims in Taylor’s amended motion were trial counsel were ineffective for (i) misadvising Taylor with regal’d to the procedure to move to discharge court-appointed counsel; (ii) failure to investigate the effects of overmedieation of Taylor; (iii) prematurely ending plea negotiations; (iv) failing to obtain the assistance of a mental health expert to aid them in their plea discussions with Taylor; (v) failing to investigate and present evidence with regard to the link between low levels of serotonin and violent behavior; (vi) failing to advise the trial court about Taylor’s recent history of seizures and medications; (vii) failing to properly advise Taylor with regard to the option of entering a plea for only the guilt phase, or of waiving a penalty phase jury trial to avoid a twelve to zero jury recommendation; (viii) failing to call neuropsy-chologist Dr. Joseph Sesta, Ph.D., as a witness during the penalty phase; and (ix) stipulating to the existence of Taylor’s 1977 burglary conviction from Elko County, Nevada. Taylor also claimed (x) the lethal injection method of execution used in Florida constitutes cruel and unusual punishment and is unconstitutional; (xi) he will be incompetent at the time of execution, which renders his execution cruel and unusual punishment and unconstitutional; and (xii) the cumulative errors by trial counsel deprived him of a fair trial.
Taylor requested an evidentiary hearing for claims i-ix, and, after a Huff[1] hearing, the postconviction court granted a hearing for claims i-vi and viii. The postconviction court determined that an evidentiary hearing was not required for claims vii and ix-xii. After the evidentiary hearing, the postconviction court rendered a final order that denied all of Taylor’s postconviction claims. This appeal followed.

Ineffective Assistance of Counsel

For a claim of ineffective assistance of trial counsel, this Court follows the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and requires that a defendant satisfy the following two requirements:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted).
The Strickland test presents mixed questions of law and fact, which compels this Court to employ a mixed standard of review when it addresses those claims, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing a circuit court’s legal conclusions de novo. See Seibert v. State, 64 So.3d 67, 75 (Fla.2010).
When addressing a claim of ineffective assistance of counsel, a court employs a strong presumption that the performance of counsel was not ineffective. See id. It is the province of the defendant to overcome this presumption and the supposition that the challenged action was the product of sound trial strategy. See Pagan v. State, 29 So.3d 938, 949 (Fla.2009). *758 Judicial scrutiny of the performance of counsel is, therefore, highly deferential. See id.
Strategic decisions of counsel do not constitute ineffective assistance of counsel “ ‘if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.’ ” Seibert, 64 So.3d at 79 (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)). To fairly assess attorney performance, a court is required to make every possible effort to eliminate the distortion caused by hindsight, to reconstruct the circumstances that surrounded the challenged conduct, and to evaluate the conduct from the perspective of counsel at the time counsel engaged in the challenged conduct. See id.
The Sixth Amendment of the United States Constitution guarantees the right to effective assistance of counsel at all critical stages of a criminal prosecution. See U.S. Const, amend. VI. In cases where a defendant is indigent, that defendant is entitled to court-appointed counsel. See Fla. R.Crim. P. 3.111(b)(1). A defendant may waive the right to counsel, so long as that waiver is conducted knowingly, voluntarily, and intelligently. See Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
The right of a criminal defendant to effective assistance of counsel includes the right to competent counsel. See McKenzie v. State, 29 So.3d 272, 282-83 (Fla.2010). Mere unhappiness or anger with the representation of counsel, or disagreement with regard to counsel’s strategic decisions, does not render counsel ineffective. See id. If court-appointed counsel is alleged to be incompetent during the trial level proceedings, a trial court must conduct a Nelson hearing to inquire into the effectiveness of counsel. See Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988) (approving the procedure provided in Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973), for an inquiry with regard to a claim of alleged ineffective assistance of counsel). However, a Nelson hearing is only required when the defendant provides a specific complaint to the trial court with regard to the ineffectiveness of counsel. See Guardado v. State, 965 So.2d 108, 113 (Fla.2007). A generalized complaint about counsel does not trigger a required Nelson hearing. See id. (“However, any [Nelson] inquiry by the trial court can only be as specific as the complaints made by the defendant. When the defendant makes generalized complaints about counsel, the trial court need not make a Nelson inquiry.”). If a defendant waives or discharges court-appointed counsel absent a finding of ineffectiveness by a trial court, the trial court is not required to appoint substitute counsel. See Hardwick, 521 So.2d at 1074-75 (quoting Nelson, 274 So.2d at 258-59).
The right to effective assistance of counsel also encompasses the right to conflict-free counsel. See Hunter v. State, 817 So.2d 786, 791 (Fla.2002). To establish ineffective assistance of counsel based on an alleged conflict of interest, the defendant must illustrate an actual conflict of interest that adversely affected the performance of counsel. See id. at 791-92. A defendant must illustrate the conflict through the identification and utilization of “specific evidence in the record that suggests that his or her interests were compromised.” Id. at 792. A mere speculative or hypothetical conflict of interest is insufficient to establish ineffective assistance of counsel based on an alleged conflict. See id. (quoting Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).
*759 In this case, Taylor incorrectly contends that the postconviction court erred when it denied his claim that trial counsel were ineffective for failure to properly advise him with regard to how to move to discharge court-appointed counsel. As established during the evidentiary hearing and memorialized in a December 2002 letter to Taylor, trial counsel accurately advised Taylor with regard to the proper mechanism for seeking the removal of counsel. More specifically, they advised Taylor that his conclusive statements that a conflict of interest existed, and the fact that he was unhappy and dissatisfied with his representation and their strategic decisions, would not serve as a basis for disqualification of his current court-appointed trial counsel and appointment of new counsel. Rather, trial counsel properly advised that, to receive an appointment of new trial counsel, he must establish that current trial counsel had provided incompetent or otherwise ineffective assistance of counsel. They also properly informed Taylor that if he waived counsel and did not establish ineffectiveness of his current trial counsel, the trial court was not required to appoint new counsel.
Further, Taylor failed to establish prejudice caused by the advice of trial counsel. As illustrated during the postconviction proceedings, if trial counsel had moved to withdraw based on the allegations of Taylor, the trial court would not have held a Nelson hearing. That is because the only statement of Taylor that pertained to the purported ineffectiveness of counsel was a blank and generalized statement that a conflict of interest existed. Taylor did not provide any specific instance or basis to support his statement of a conflict of interest, or establish how he was prejudiced by his failure to move to have counsel discharged. Therefore, competent, substantial evidence supports the finding of the postconviction court that trial counsel were not ineffective, and this claim is without merit.
Next, Taylor contends that the postconviction court incorrectly denied his claim that trial counsel were ineffective for failure to properly investigate the effects of the alleged overmedication of Taylor. The performance of counsel is not deficient, even when counsel fails to seek a competency evaluation with regard to the effects of psychotropic medication, so long as there is no evidence that calls into question the competency of the defendant. See Groover v. State, 574 So.2d 97, 99 (Fla.1991). For example, in Groover, the defendant was administered large doses of Mellaril, a powerful antipsychotic medication, during his pretrial and trial incarceration. See id. This Court upheld the finding of the postconviction court that the failure of trial counsel to seek a competency evaluation with regard to the effects of this medication did not constitute deficient performance because there was no evidence that called the competency of the defendant into question. See id.
In this ease, trial counsel testified during the evidentiary hearing that they did not investigate the effects of Taylor’s medication because Taylor displayed no outward signs that his medication had any negative effects on his cognitive functions. According to trial counsel, Taylor appeared to be coherent and in full possession of his faculties, and he was engaged and active during the pretrial and trial proceedings. Trial counsel also testified that they did not notice any odd behavior that was indicative of a medication overdose.
The testimony of Dr. Donald Taylor, M.D., during the postconviction evidentia-ry hearing bolstered the validity of the testimony of trial counsel. Dr. Taylor testified concerning his four-hour competency *760 evaluation of Taylor that occurred between the guilt and penalty phases of trial. Dr. Taylor stated that Taylor displayed no evidence of cognitive impairment or overmed-ication during this time. According to Dr. Taylor, Taylor appeared alert and engaged for the duration of the evaluation, and was able to relay to Dr. Taylor a detailed life and medical history, as well as an accurate description of the type and dosage of medication he was prescribed. We hold that competent, substantial evidence supports the postconviction court’s finding that trial counsel were not ineffective for their decision not to investigate the alleged overmedication of Taylor.
Taylor also claims that the postconviction court erred when it denied his claim that trial counsel were ineffective for prematurely ending plea discussions and for their failure to use a mental health expert during the plea discussions. A criminal defendant is entitled to effective assistance of counsel during the plea process. See Cottle v. State, 733 So.2d 963, 965 (Fla.1999). To establish ineffective assistance of counsel based upon the failure of trial counsel to convey a plea to a defendant, the defendant must prove that:
(1) counsel failed to communicate a plea offer or misinformed defendant concerning the penalty faced, (2) defendant would have accepted the plea offer but for the inadequate notice, and (3) acceptance of the State’s plea offer would have resulted in a lesser sentence.
Id. at 967 (emphasis added).
Florida Rule of Criminal Procedure 3.171(c) provides the obligations of trial counsel in connection with plea negotiations and the entry of a plea:
(c) Responsibilities of Defense Counsel.
(1) Defense counsel shall not conclude any plea agreement on behalf of a defendant-client without the client’s full and complete consent thereto, being certain that any decision to plead guilty or nolo contendere is made by the defendant.
(2) Defense counsel shall advise defendant of:
(A) all plea offers; and
(B) all pertinent matters bearing on the choice of which plea to enter and the particulars attendant upon each plea and the likely results thereof, as well as any possible alternatives that may be open to the defendant.
(Emphasis added.) In accordance with this rule, defense counsel have a duty to obtain the consent of a defendant before they execute a plea agreement on behalf of that defendant, and to advise the defendant of all plea offers and pertinent matters with regard to a plea. See Fla. R.Crim. P. 3.171. There is, however, no explicit, delineated duty provided in rule 3.171 that requires counsel to ever seek the aid of a third party or mental health expert during the plea discussions. See id.
In this case, the postconviction court’s finding that trial counsel were not ineffective during the plea negotiations was supported by competent, substantial evidence. As established during the postconviction evidentiary hearing, trial counsel believed that it was in the best interest of Taylor to plead guilty in exchange for a life sentence to avoid the death penalty. In February 2003, trial counsel — with the consent of Taylor — explored such a plea offer with the State. However, before the State responded, Taylor decided to rescind his consent to explore a plea offer. Regardless of Taylor’s actions, the State and its homicide committee rejected that offer before it could be withdrawn by trial counsel. Then, in March 2004, immediately before the start of trial, the State approached defense counsel concerning the possibility of a plea offer, contingent on the assurance *761 of Taylor that he would accept such a formal offer if made. When defense counsel approached Taylor, he rejected that plea possibility, which resulted in the State’s decision to not proceed further with any formal plea offer.
The actions of trial counsel during the plea discussions were in accord with prevailing professional norms and they followed rule 3.171, i.e., trial counsel did not make or accept a plea offer without the consent of Taylor. Further, trial counsel cannot be held ineffective for their actions during the plea process because Taylor has failed to establish prejudice, i.e., that he would have accepted a formal plea offer if one was made. See Cottle, 733 So.2d at 967. Rather, all evidence presented during the postconviction proceedings illustrated that Taylor wavered between whether to accept a plea or reject a plea, which resulted in a decision to reject a plea offer, as well as a decision to not pursue a possible plea offer by the State.
Furthermore, competent, substantial evidence supports the postconviction court’s finding that trial counsel were not ineffective in their decision not to engage the assistance of a mental health expert during the plea discussions with Taylor. As previously discussed, Taylor appeared competent and engaged during the trial proceedings. Dr. Taylor also testified that when he interviewed the defendant in 2004, Taylor was competent and displayed no sign of cognitive impairment. Thus, trial counsel did not perform deficiently when they did not obtain the assistance of a mental health expert during the plea negotiations because trial counsel reasonably concluded that the aid of such a mental health expert was not needed due to the apparent competency of Taylor during the plea negotiations.
Taylor has also failed to establish prejudice from trial counsel’s decision not to utilize the assistance of a mental health expert during plea negotiations. More specifically, Taylor did not present evidence to establish that the outcome of the trial court proceedings would have been different if plea discussions included a third party expert, i.e., he did not establish that, if a mental health expert had participated in the plea discussions, he would have altered his decision to reject a plea possibility and would have accepted a plea offer. Accordingly, Taylor fails under the prejudice prong of Strickland. See Cottle, 733 So.2d at 967 (stating that to prove ineffective assistance of counsel with regard to plea discussions, the defendant must establish that if counsel acted differently, he or she would have accepted a possible plea).
Taylor further contends that the postconviction court incorrectly denied his claim that trial counsel were ineffective for their failure to investigate the alleged link between Taylor’s low levels of serotonin and his violent behavior, and for their failure to present evidence of Taylor’s alleged seizures and seizure medication. To determine if counsel was ineffective for failure to present evidence of mitigation, a court will examine not only the failure to investigate and present possibly mitigating evidence, but the reasons for doing so. See Jones v. State, 998 So.2d 573, 582 (Fla.2008). The defendant must also establish that the performance of counsel deprived him or her of a reliable penalty proceeding. See id.
Although counsel is not required to conduct a mental health evaluation for mitigation purposes in every capital case, he or she does have a strict duty to reasonably investigate the background of a defendant for possible mitigating evidence. See id. at 583. When available information points to the existence of men *762 tal health issues, an evaluation is fundamental to a proper defense against the death penalty. See id. However, a mere conclusive allegation that the presentation of mental health evidence would have changed the outcome of a proceeding is insufficient to prove prejudice. See id. at 584. Rather, the defendant must establish that had the evidence been presented, there was a reasonable probability that the outcome of the relevant proceeding would have been different. See id. More specifically, in the context of deficient performance during the penalty phase, a defendant establishes prejudice by showing that, absent the deficient performance, there is a reasonable probability that the trial court’s balancing of aggravators and mitigators would have been different, or that confidence in the outcome of the penalty phase has been substantially impaired or undermined. See id. at 585; see also Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (“A reasonable probability is a probability sufficient to undermine confidence in the outcome.”).
In this case, competent, substantial evidence supports the finding of the postcon-viction court that trial counsel did not act deficiently when they did not present evidence with regard to the alleged low levels of serotonin of Taylor at the time of the homicide. Although Dr. James R. Meri-kangas, M.D., testified at the postconviction evidentiary hearing that Taylor may have low serotonin, Taylor failed to establish that in fact he had low serotonin either permanently or at the time of the homicide. In fact, during the postconviction evidentiary hearing, Dr. Merikangas could not confirm that Taylor ever had low serotonin and admitted that the serotonin levels of Taylor had never been physically tested. Dr. Joseph John Sesta, Ph.D., also testified during the evidentiary hearing and stated that he could not confirm to a reasonable degree of medical certainty that Taylor ever had low levels of serotonin, or that such a serotonin deficiency existed at the time of the homicide.
Further, Taylor failed to establish how the decision of trial counsel to not present evidence of his alleged low serotonin prejudiced him. He did not provide testimony as to how the presentation of such evidence would have led to the mitigation of his sentence, or how its absence exacerbated the severity of the recommended sentence of the jury. It is also a dubious proposition that testimony with regard to low serotonin would have altered the jury’s unanimous recommended sentence of death, especially given the penalty phase evidence presented with regard to the mental health issues of Taylor. That evidence included the testimony of Dr. Harry Krop, Ph.D., which provided a detailed description of the asserted cognitive impairments of Taylor that included frontal lobe syndrome and brain injuries, as well as a litany of mental health diagnoses that included adjustment disorder, depression, borderline personality disorder, and antisocial personality disorder. Dr. Krop also testified during the penalty phase that Taylor abused alcohol and was intoxicated at the time of the homicide, which, along with his mental health disorders, affected his ability to conform his conduct to the requirements of law. Included in Dr. Krop’s testimony were factors with regard to the emotional and physical abuse Taylor suffered as a child. Accordingly, competent, substantial evidence exists to support the postconviction court’s finding that trial counsel were not ineffective in their failure to present evidence of Taylor’s alleged low serotonin.
There is also competent, substantial evidence to support the postconviction court’s finding that trial counsel were not deficient in their failure to advise the trial *763 court about the alleged recent history of Taylor’s seizures and his seizure medications. During the evidentiary hearing, there was a third-party report that Taylor suffered a seizure while he was incarcerated in 2001, as well as evidence presented of seizure medications prescribed to Taylor while incarcerated for this crime, i.e., Dilantin and Depakote. During the postcon-viction hearing, Dr. Merikangas opined that Taylor had a seizure disorder. Despite this evidence, given the medical history of Taylor, uncertainty existed nonetheless as to whether Taylor even suffered from a seizure disorder. More specifically, Taylor, while incarcerated from 1991 to 2000, was not prescribed seizure medication because an EEG exam performed on him in 1991 revealed no seizure disorder and normal brain activity. The testimony of Dr. Taylor compounded the uncertainty as to the existence of a seizure disorder. He testified that in 2006 Taylor reported to him that he suffered no recent seizures and questioned whether he even suffered from a seizure disorder because all he ever experienced were mere blackout spells.
Therefore, given the disputed evidence that surrounded the alleged seizure disorder, there was competent, substantial evidence to support the finding that trial counsel did not act deficiently when they failed to advise the trial court about Taylor’s alleged recent seizures and seizure medications. Even if trial counsel were deficient, Taylor failed to establish how he was prejudiced by the performance of trial counsel. As supported by the record, trial counsel presented extensive mitigation evidence of Taylor’s mental health, emotional, and physical issues during the penalty phase. Taylor has failed to establish how the mere addition of equivocal and disputed evidence of alleged recent seizures and seizure prescriptions would have altered the unanimous recommendation of the death penalty by the jury. Therefore, the postconviction court was correct in finding that Taylor is not entitled to relief.
In Taylor’s next claim, he contends that the postconviction court incorrectly denied his claim that trial counsel were ineffective for their failure to present Dr. Sesta as a witness during the penalty phase. This Court has consistently held that the strategic decision of trial counsel not to present a certain witness does not constitute ineffective assistance of counsel if that decision was the product of a reasonable trial strategy. See Everett v. State, 54 So.3d 464, 474 (Fla.2010). For example, in Bowles v. State, 979 So.2d 182, 188 (Fla.2008), this Court held that the decision to not present a mental health expert did not constitute ineffective assistance of counsel because that decision, given the possible damaging effects of the witness’s testimony, was based on a reasonable trial strategy.
As addressed during the postconviction evidentiary hearing, trial counsel, although they respected Dr. Sesta and his credentials, strategically did not think that Dr. Sesta would have been a positive witness for Taylor. Among the numerous reasons was that Dr. Sesta unilaterally conducted psychological testing of Taylor that trial counsel did not consider helpful or useful to the disposition of Taylor’s case, i.e., Dr. Sesta performed a personality test on Taylor even though trial counsel did not request this testing. It was also established at the evidentiary hearing that trial counsel did not consider the prospect of Dr. Sesta’s testimony or results of his testing — along with his accompanying diagnosis of Taylor — to be beneficial to Taylor because the opinion would have conflicted with the testimony of other defense witnesses, Dr. Krop and Dr. David McCra-ney, M.D. More specifically, Dr. Sesta’s *764 testimony would have conflicted with that of Dr. McCraney and Dr. Krop with regard to the brain impairment of Taylor— i.e., its severity, etiology, and time of occurrence — with Dr. McCraney and Dr. Krop finding the brain damage of Taylor to be more severe. Therefore, to avoid a conflict in opinion testimony -with regard to the personality disorder and brain impairment of Taylor, trial counsel made a reasonable strategic decision to present the testimony of Dr. Krop and Dr. McCraney, and not Dr. Sesta.
In addition, Taylor contends that the postconviction court acted incorrectly when it denied his claim that the cumulative errors of trial counsel deprived him of a fair trial. Taylor has failed to establish any meritorious claim of ineffective assistance of trial counsel. Therefore, there are no cumulative errors of trial counsel that equate to a degradation of his fundamental right to a fair trial. See Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (holding that when the errors raised by a defendant are meritless, procedurally barred, or fail to meet the Strickland requirements, the contention of cumulative error is without merit).
Lastly, Taylor contends that he will be subject to cruel and unusual punishment at the time of execution because he is not legally competent. Taylor concedes that this claim is not ripe for review by this Court. Therefore, no relief is warranted. See Anderson v. State, 18 So.3d 501, 522 (Fla.2009) (stating that when a defendant concedes that a claim is not ripe for review because he has not been declared incompetent and no death warrant has been signed, and that he has raised it only for preservation purposes, no relief is warranted).

Petition for Writ of Habeas Corpus

In his petition for writ of habeas corpus, Taylor contends that his counsel on direct appeal was ineffective because she raised only boilerplate issues on direct appeal, improperly contested the constitutionality of the standard penalty phase jury instructions when a special instruction was given, and failed to raise meritorious issues that had been presented before the trial court.
A claimant appropriately raises a claim of ineffective assistance of appellate counsel in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant ha-beas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). In raising such a claim, the defendant bears the burden to allege specific, serious omissions or overt acts upon which a claim of ineffective assistance of appellate counsel may be based. See Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981).
In this case, appellate counsel performed deficiently when she challenged the constitutionality of a standard penalty phase jury instruction on direct appeal because that instruction was not given by the trial court. More specifically, on direct appeal, this Court rejected the challenge to the standard jury instruction by appellate counsel because we have repeatedly determined that the specific instruction did not shift the burden of proof to the defendant and was constitutional. *765 See Taylor v. State, 937 So.2d 590, 600 (Fla.2006). This Court also rejected that challenge because the trial court did not use the standard jury instruction, but rather, used a special instruction that informed the jury that it could recommend a sentence of death only if it found that the aggravating circumstances outweighed the mitigating circumstances. See id. Thus, when appellate counsel contested the standard jury instruction instead of the special instruction that had been given by the trial court, she performed deficiently because a reasonable attorney who acted within professional norms would not have contested the validity of a jury instruction that was not read by the trial court.
However, Taylor has failed to establish how the deficient performance of appellate counsel prejudiced him to such a degree that it undermined confidence in the correctness of the result of his direct appeal. Taylor has failed to establish how the decision to contest the standard instruction deprived him of a meaningful direct appeal, or how the decision of appellate counsel negatively affected the result of his direct appeal. Even if appellate counsel had contested the special instruction, the outcome of Taylor’s direct appeal would not have been altered because the more detailed, special instruction would probably have been affirmed as proper.
Lastly, Taylor has failed to sufficiently establish either deficient performance or prejudice emanating from the alleged error by appellate counsel for raising boilerplate issues rather than allegedly meritorious issues on direct appeal. Taylor merely lists an abundance of claims that appellate counsel could have raised on direct appeal. He does not provide a factual or legal basis as to why appellate counsel was ineffective for failing to raise those claims. Therefore, Taylor has failed to provide a sufficient basis for which this Court may grant relief.

Conclusion

For the foregoing reasons, we affirm the postconviction court’s denial of Taylor’s rule 3.851 motion and deny Taylor’s petition for a writ of habeas corpus.
It is so ordered.
CANADY, C.J., and LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs in result.

. Huff v. State, 622 So.2d 982 (Fla.1993).