# Supreme Court of Florida

---

No. SC2021-1070

---

**REYNALDO FIGUEROA-SANABRIA,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 29, 2023

COURIEL, J.

Reynaldo Figueroa-Sanabria was convicted of two counts of first-degree murder after stabbing John Travlos and Germana Morin to death on their houseboat. *See* § 782.04(1)(a), Fla. Stat. (2013). At the end of the penalty phase, he was sentenced to death for each murder. This is Figueroa-Sanabria's direct appeal of his convictions and sentences, over which we have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

We affirm Figueroa-Sanabria's convictions. The trial court committed no reversible error during Figueroa-Sanabria's guilt

phase proceedings, and the State presented competent, substantial evidence to support the jury's verdicts. But we set aside Figueroa-Sanabria's sentences of death and remand his case for a new penalty phase because we find that he was deprived of his right to "have the Assistance of Counsel for his defence" when the trial court put him to an improper choice at the outset of that phase of the proceedings. Amend. VI, U.S. Const.

**I**

**A**

Early in the morning on April 12, 2013, Germana Morin and John Travlos were stabbed to death on their houseboat in St. Petersburg. Both were found face down; duct tape bound together Morin's ankles and wound around Travlos's left wrist and ankle.

Morin was stabbed first in bed and then, mortally, on the ground. A stab wound twenty centimeters long severed her jugular vein; it was deep enough to hit a disc of her spinal cord. She also suffered two stab wounds to the chest, which resulted in two perforations of her left lung and slowly made it harder for her to breathe. Travlos, too, was first stabbed in bed, then suffered ten

more stab wounds to his chest before he died. The intruder made off with the victims' jewelry, valued at over $80,000.

As the authorities investigated, they learned that the last time the victims were seen alive was around 9:00 p.m. on April 11 by a visiting neighbor. Security footage showed that the houseboat's motion-sensing lights, which could be triggered by a person walking across the gangplank, turned off at 10:42 p.m. on the 11th and were next illuminated at 2:29 a.m. on the 12th. The lights then turned off at 3:49 a.m. and did not come on for the rest of the day. An examination of Travlos's computer revealed that someone had used it to access his contact list at 3:43 a.m. That list contained the combination to his safe where some of the jewelry was stored. There was no evidence of damage to any of the locks on the houseboat. Two workers found the bodies around 11:00 a.m.

According to a neighbor, Reynaldo Figueroa-Sanabria was seen at the houseboat at 7:00 p.m. on the 11th, but he left soon after. Figueroa-Sanabria, the victims' handyman, was often given a key to the houseboat so that he could access it to work. Some weeks earlier, according to both Figueroa-Sanabria and other

witnesses, Figueroa-Sanabria had argued with Travlos about his wages, but he eventually returned to the job.

Figueroa-Sanabria lived in an apartment complex across the street from the marina where the houseboat was docked with his girlfriend, Tessa Cooper. According to Cooper, who later assisted the police with its investigation, the couple went to sleep around 1:00 a.m. on the 12th. She woke up to a phone call from Figueroa-Sanabria around 4:30 a.m. that morning. He sounded to Cooper "like he was in a panic" and asked her to pick him up near the marina.

Cooper found Figueroa-Sanabria holding a backpack. He told her that he needed to travel to New York to see his brother.[1] The couple stopped at their apartment before heading to the airport. On the way to the airport, however, Figueroa-Sanabria told Cooper he had changed his mind; he asked her to take him to rent a car.

---

1. Figueroa-Sanabria was in frequent communication with his brother on the 11th and 12th. One detective testified that certain text messages sent to Figueroa-Sanabria by his brother after the crimes occurred were no longer on Figueroa-Sanabria's phone.

Cooper later testified that, sometime during this drive, she saw Figueroa-Sanabria hold a knife in his lap with his hand over it.

They stopped at a gas station and Cooper vacuumed out her van. Figueroa-Sanabria walked over to a dumpster and threw away some grocery bags. Later, the assistant manager of the gas station discovered bloodstained clothes in the dumpster, including two t-shirts—one white and the other gray—a pair of jeans, and a belt, all of which Cooper later identified as Figueroa-Sanabria's.[2] After leaving the gas station, the couple went back to their apartment, and then later went on the hunt for a rental car.

Failing to find one, the couple instead went to a jewelry store. There, around 9:30 a.m., Figueroa-Sanabria sold a necklace and bracelet for a combined $2,569, which included $2,000 in bills wrapped in a bank strap.[3] Cooper testified that Figueroa-Sanabria

---

2. Some of the clothing also had what appeared to be white paint stains. Figueroa-Sanabria testified that he had been painting the victims' houseboat on April 11.

3. Figueroa-Sanabria also tried to sell two rings but, according to testimony of a staff member at the jewelry store, he decided against it when the staff member informed him that a gemologist would need to look at them first. Figueroa-Sanabria told one investigator that he had owned the jewelry for a while, yet at

carried the jewelry in the backpack that he had when she picked him up earlier that morning.

After leaving the jewelry store, Figueroa-Sanabria finally found a company that would rent him a car. There, after Figueroa-Sanabria instructed Cooper to mention nothing about the morning other than that she dropped him off at a car rental business and that he was traveling to see his brother, the couple parted ways. Figueroa-Sanabria began to travel northeast, reaching a shipping business in Palm Coast on the afternoon of the 12th. From there, Figueroa-Sanabria sent a package to his brother in New York. It was later found to contain over one hundred pieces of jewelry.

As Figueroa-Sanabria continued north, the investigation into the murders began. According to the testimony of a detective, the name "Rey" came up repeatedly around the marina. Soon investigators found the apartment complex where Cooper and Figueroa-Sanabria lived and impounded the van that the couple had been driving around town. Cooper told the police what had

---

another point testified that Cooper had given it to him that morning. The jewelry was later identified as Travlos's.

happened earlier that morning.[4]  They persuaded a judge to issue a warrant for Figueroa-Sanabria's arrest.

Figueroa-Sanabria's run ended just hours later in North Carolina.  The officer who arrested him explained that law enforcement in Florida wanted to speak with him; Figueroa-Sanabria replied that he "figured they would."  A search of Figueroa-Sanabria's vehicle revealed, among other things, a cell phone with the battery removed and a black backpack.  He was carrying the money band from the jewelry store that he had visited the prior day; later, he tried to get rid of it outside the county jail where he was held.  An officer found it tucked behind a gutter.

On April 18, 2013, a grand jury indicted Figueroa-Sanabria on two counts of first-degree murder.

---

4.  Cooper and Figueroa-Sanabria remained in communication throughout the day on the 12th.  At one point, Figueroa-Sanabria texted Cooper asking her if she had seen the police.  He told her that he had received a call from the property manager of their apartment complex informing him that police were there and wanted to speak with him.

## B

The court appointed Keith Hammond as Figueroa-Sanabria's lawyer in January 2014 after the public defender's office withdrew for conflict reasons.[5] The attorney-client relationship between Figueroa-Sanabria and Hammond was fraught. Over the next five years, Figueroa-Sanabria repeatedly expressed dissatisfaction with Hammond's representation. Along with complaints raised in pretrial hearings, Figueroa-Sanabria filed three motions before trial in which he asked the court to dismiss Hammond and appoint new counsel. His grievances included a lack of communication and a lack of progress in preparing for trial. For example, at one hearing Figueroa-Sanabria told the court that Hammond had not visited him for almost a year, and at a later hearing he told the court that Hammond had only been to see him ten times in the preceding twenty-two months, with the visits cumulatively lasting less than ten hours.

---

5. The court also appointed Daniel Hernandez as co-counsel, who was assigned to handle the penalty phase if Figueroa-Sanabria was convicted.

Hammond himself recognized these issues, telling the court once that he had an "ethical problem" because of his workload and low staffing, and then suggesting to the court that it should "seriously consider appointing somebody else." At another hearing, speaking of Figueroa-Sanabria, Hammond remarked that "I drive him crazy, and he drives me crazy." And on another occasion, Hammond said that his ability to represent Figueroa-Sanabria was "borderline," and projected that his representation of Figueroa-Sanabria was "going to cause a problem for the next 20 years." Despite these issues, Hammond told the court that he could represent Figueroa-Sanabria.

All three motions filed by Figueroa-Sanabria were denied by the trial court.[6] Each time, the court, after a hearing, found that Figueroa-Sanabria had not provided an adequate basis for his request and that Hammond was providing adequate representation. After the first request, which was in October 2014, Hammond met

---

6. The three motions were denied by three different trial judges. The first, Judge Nancy Moate Ley, moved divisions, so Judge Thane Covert took over in early 2015. Judge Pat Siracusa then took over in early 2017 and eventually presided over the trial.

twice with Figueroa-Sanabria, demonstrated progress on discovery matters, and successfully sought a continuance. At one point, however, after his second request to replace Hammond was denied, Figueroa-Sanabria decided to represent himself. But almost six months later, in August 2016, he changed his mind and asked for counsel. Hammond, who was serving as standby counsel, was reinstated.

In September 2017, after denying Figueroa-Sanabria's third request to replace Hammond, the court asked Figueroa-Sanabria to list discovery objectives that he wanted accomplished. It told Figueroa-Sanabria that it would appoint a new attorney if Hammond failed to accomplish what was listed. Hammond demonstrated progress over the course of pretrial hearings that took place the next year; however, Figueroa-Sanabria continued to send letters to the court documenting his frustration with Hammond's representation.

In March 2019, the trial court asked Hammond and the State about the progress of certain discovery matters. Among other things, Figueroa-Sanabria had requested several depositions and background checks, and the acquisition of surveillance videos from

the gas station where the clothes were dumped. Hammond sought a continuance to allow for additional time to prepare for trial, which the court granted. Over the next months, Hammond again displayed progress when it came to Figueroa-Sanabria's requests, leading the trial court to conclude that the case was ready to be tried.

Only a few days before trial, though, Figueroa-Sanabria wrote another letter to the court with objections about Hammond's representation. He again complained about Hammond's lack of communication and lack of progress in investigating certain issues, such as whether the clothes found in the dumpster were Figueroa-Sanabria's size or had his DNA on them, and the State's acquisition of Figueroa-Sanabria's cell phone and the historical cell site location information (CSLI) about the phone's usage.[7] The court

---

7. When a cell phone is in use, it connects "to a set of radio antennas called 'cell sites,'" which "typically have several directional antennas that divide the covered area into sectors." *Carpenter v. United States*, 138 S. Ct. 2206, 2211 (2018). Each time a cell phone connects to one of these cell sites, "it generates a time-stamped record" that constitutes CSLI. *Id.* In this case, as the intelligence analyst testified at trial, the historical CSLI allowed investigators to determine "a geographical area that the device could have been in" at the time of an incoming or outgoing phone

acknowledged receipt of the letter before jury selection began, and later that same day asked Figueroa-Sanabria if he had any questions or concerns that it could address. At that point, however, Figueroa-Sanabria did not mention any issue with Hammond, and he did not again raise an issue with Hammond's representation throughout the rest of the trial.

Figueroa-Sanabria, though, did ask the court about certain evidentiary issues, including the State's acquisition of historical CSLI. Figueroa-Sanabria argued that the State's warrantless acquisition of five days' worth of CSLI, which the State planned to use in establishing Figueroa-Sanabria's whereabouts on the dates relevant to the murders, violated the Fourth Amendment.[8]

In response, the State told the court that it went through all of the normal procedures for acquiring the evidence and had the

---

call. It provides nothing further, however, such as a precise GPS location of the device.

8. Five years after the historical CSLI was acquired in this case, but before trial, the United States Supreme Court concluded in *Carpenter* that the acquisition of seven days of historical CSLI constituted a search under the Fourth Amendment, and as such, had to be supported by a warrant issued upon probable cause. 138 S. Ct. at 2217 n.3.

documentation to prove it.[9]  After hearing this, the trial court did not rule on the admissibility of the evidence in light of the Fourth Amendment.  Instead, the court only provided that the acquisition of the historical CSLI would "certainly be part of the appellate issues that [Figueroa-Sanabria] would be contesting" if he was convicted.  The record does not reflect any further objection when the historical CSLI evidence was admitted at trial.

During the two-week trial that finally began on October 8, 2019, the jury heard from the officers who conducted the investigation.  They heard from those with whom Figueroa-Sanabria had interacted during the morning of April 12, such as the staff member at the jewelry store that purchased the necklace and bracelet, and the owner of the rental car business who rented Figueroa-Sanabria the vehicle.  The jury also heard from Cooper, who testified about what had happened after she picked up Figueroa-Sanabria on the morning after the murders, and the girlfriend of Figueroa-Sanabria's brother, who testified about

---

9.  The State later produced the subpoena used to acquire the historical CSLI.

- 13 -

receiving the jewelry in the mail. The State additionally called the medical examiner, who informed the jury that the cause of death for both victims was multiple sharp-force injuries and the manner of death for both was homicide.

The jury heard from an intelligence analyst who had mapped out the general positioning of Figueroa-Sanabria and Cooper on April 11 and 12 using the historical CSLI acquired from Figueroa-Sanabria's and Cooper's service providers. The CSLI evidence revealed that, when Figueroa-Sanabria and Cooper spoke at 4:15 a.m. and 4:16 a.m., his phone used an antenna south of the one it normally used when he was at the marina or his apartment. However, the analyst also testified that the southern antenna sometimes provides the strongest signal for a phone at the marina.

In contrast, the analyst testified that Cooper's phone used one antenna, at the same longitude and latitude, throughout the night of the 11th and into the morning of the 12th when she communicated with Figueroa-Sanabria at 4:15 a.m. and 4:16 a.m. This antenna covered the area where both the marina and the couple's apartment were located.

A DNA analyst also took the stand. The analyst testified that Figueroa-Sanabria's DNA was found, within a reasonable degree of scientific certainty, on both a roll of duct tape and a wad of duct tape left at the scene. As the jury learned from a trace materials analyst who also testified, the duct tape used to restrain both victims came from this roll. As for the white shirt found in the dumpster, the DNA analyst testified that the blood from the cuff area of the right sleeve matched Morin's DNA within a reasonable degree of scientific certainty, and testing of blood on the collar revealed that Travlos's DNA was a major contributor. As for the jeans, testing of blood in three areas revealed the presence of Travlos's DNA within a reasonable degree of scientific certainty, and testing of blood on another area of the jeans revealed the presence of Morin's DNA within a reasonable degree of scientific certainty.[10] The analyst also conducted testing on carpet clippings from the

---

10. The analyst performed additional DNA tests on different areas of the white and gray shirts, the jeans, and the belt, but the results were largely inconclusive as to the presence of the DNA of Figueroa-Sanabria and Cooper.

front passenger side of Cooper's van, which revealed the presence of Travlos's DNA within a reasonable degree of scientific certainty.

After the State rested, Hammond called only one witness: Figueroa-Sanabria. He testified that he awoke around 4:00 a.m. on April 12 to find that Cooper was gone. He said he called her, and she told him that she had gone to get cigarettes. When she returned, according to Figueroa-Sanabria, she asked him to drive her to an addiction treatment center. On the way to the treatment center, he said, Cooper asked him to stop at a gas station and vacuum out her van. She also, he said, asked him to throw away a grocery bag in the dumpster, which he did.

Figueroa-Sanabria testified that Cooper was the source of the jewelry-filled backpack, which, he said, she gave him to make up for her selling his vehicle while he served a stint in prison. Figueroa-Sanabria testified that he decided to sell some of the jewelry, which he did at a jewelry store. Figueroa-Sanabria said that he gave Cooper most of the money earned from selling the jewelry, and that he promised her the proceeds from future sales. Figueroa-Sanabria said that he eventually rented a car, planning to visit his brother in New York, who would help him sell the rest of the jewelry. On the

way to New York, Figueroa-Sanabria shipped the jewelry to his brother.

On October 23, the jury returned guilty verdicts for both first-degree murder charges.

## C

The matter proceeded to the penalty phase. At a hearing on October 28, Daniel Hernandez, who had at that point taken over as counsel, told the court that Figueroa-Sanabria did "not wish mitigation to be presented." The court asked Figueroa-Sanabria if those were in fact his wishes. He responded that he did not want his friends and family to "beg for life" to the jury on his behalf. Hernandez said he "obviously . . . was not seeking to do something against [Figueroa-Sanabria's] wishes," but he "suspected that the Court would require [him] to do so." After failing to convince Figueroa-Sanabria that he should present mitigation, the court said that if Hernandez "wants to call [mitigation witnesses]," then the court is "going to let him call them so that they can do what's necessary." Figueroa-Sanabria responded by stating that if the court is "going to let [Hernandez] do it, then [he] would like to

dismiss [Hernandez]" and represent himself.  The court made this

effort to confirm Figueroa-Sanabria's decision:

> **THE COURT:** Okay.  So, Mr. Sanabria, are you telling me that not only you don't want your family members to testify on your behalf, but you also don't want the doctors to testify on your behalf[?]  Is that what you're saying?
> **THE DEFENDANT:** Yeah, I don't.
> **THE COURT:** You want nothing presented on your behalf?  And for the record he's shaking his head.  Now he doesn't want anything.
> **THE DEFENDANT:** No, your Honor.  I'm sorry.  No.
> **THE COURT:** Now you're saying you're willing to represent yourself.  If I'm going to order Mr. Hernandez to present things on your behalf, you'll represent yourself so that you won't have to present anything because I may have to order Mr. Hernandez to present things on your behalf?
> **THE DEFENDANT:** That's what I say, your Honor, yes.

After taking a short break, the court told Figueroa-Sanabria

that it could not have defense counsel "go forward representing

[him] not presenting . . . any mitigation," and so "if [Hernandez]

represents [Figueroa-Sanabria], he's going to present mitigation on

[Figueroa-Sanabria's] behalf."  The colloquy concluded this way:

> **THE COURT:** With that in mind do you want to represent yourself or do you want to let Mr. Hernandez present the mitigation against your wishes?
> **THE DEFENDANT:** I don't want no mitigation.
> **THE COURT:** Okay.  So you want to represent yourself and not put on any mitigation?
> **THE DEFENDANT:** Yes, your Honor.

After a court-appointed expert witness testified that Figueroa-Sanabria was competent to make the decision to waive mitigation and represent himself, the court held a *Faretta*[11] hearing. At this hearing, the court inquired into Figueroa-Sanabria's knowledge of the relevant law and procedural rules, reminded Figueroa-Sanabria of the difficulties of self-representation, and told Figueroa-Sanabria that he would not have much time to prepare before the penalty phase started. The trial court also ensured that Figueroa-Sanabria understood that the maximum penalty he could receive was death and told him that he would have a much better chance to receive a sentence of life if he was represented by counsel. Figueroa-Sanabria still chose to proceed pro se.

Before accepting Figueroa-Sanabria's waiver, the trial court asked Hernandez if there was any lawful reason that the court should not accept Figueroa-Sanabria's decision, and Hernandez responded that there was not. After Hernandez summarized the

---

11. *Faretta v. California*, 422 U.S. 806 (1975) (concluding that a defendant has a constitutional right to proceed without counsel in a state criminal trial as long as he knowingly, intelligently, and voluntarily chooses to do so).

mitigation evidence he planned to present, the court accepted Figueroa-Sanabria's waiver and appointed Hernandez as standby counsel.

During the penalty phase, the State presented one expert witness—who testified to the physical and medical condition of the victims—and victim impact testimony. Figueroa-Sanabria did not present mitigation evidence, nor did he provide an opening statement or closing argument. After the State's closing argument, the trial court instructed the jury on its duties, and deliberations began.

An hour in, the jury returned with questions about the verdict form, and Hernandez offered to provide some assistance. After the court assured Figueroa-Sanabria that the reinstatement of Hernandez would not affect his waiver of mitigation, Figueroa-Sanabria agreed to allow Hernandez to represent him again.

Following deliberations, the jury unanimously found five aggravating factors and unanimously recommended sentences of death. After a series of *Spencer*[12] hearings at which both sides

---

12. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993) (setting out a procedure that affords both the State and the defendant an

presented evidence on, among other things, whether Figueroa-Sanabria was cognitively impaired, the trial court sentenced Figueroa-Sanabria to death for each murder.  This appeal follows.

## II

## A

Figueroa-Sanabria argues that two errors committed during the guilt phase require us to set aside his convictions.  First, Figueroa-Sanabria argues that the trial court erred in refusing, more than once, to appoint new counsel before the start of the guilt phase.  Second, Figueroa-Sanabria argues that the trial court erred in admitting historical CSLI that had been acquired without a warrant, in violation of the Fourth Amendment.  Neither alleged error justifies reversing Figueroa-Sanabria's convictions.  And because, after a review of the record, we find that Figueroa-Sanabria's convictions are supported by competent, substantial evidence, we affirm them.

---

opportunity to be heard and present additional evidence to the trial court before it decides whether to impose a death sentence).

**1**

As to the first issue, Figueroa-Sanabria argues that the trial court erred in refusing to dismiss Hammond from the case and appoint substitute counsel.[13] We review a "trial court's decision involving withdrawal or discharge of counsel . . . for abuse of discretion." *Guardado v. State*, 965 So. 2d 108, 113 (Fla. 2007). Discretion is abused only when no reasonable person "would take the view adopted by the trial court." *Canakaris v. Canakaris*, 382

---

13. Figueroa-Sanabria argues that the trial court violated the Sixth Amendment to the United States Constitution, which guarantees him "the Assistance of Counsel for his defence," amend. VI, U.S. Const., when it denied his motions to dismiss Hammond and appoint substitute counsel after it became apparent that the relationship between Figueroa-Sanabria and Hammond had "completely collapsed." But the U.S. Supreme Court has rejected the claim "that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Instead, the Sixth Amendment only guarantees "the right to effective assistance of counsel at all critical stages of a criminal prosecution." *Taylor v. State*, 87 So. 3d 749, 758 (Fla. 2012). Recognizing that our cases generally leave ineffective assistance arguments for postconviction proceedings, *see Steiger v. State*, 328 So. 3d 926 (Fla. 2021), Figueroa-Sanabria does not now argue that Hammond was ineffective. Because of this, we decline to consider Figueroa-Sanabria's Sixth Amendment arguments related to Hammond.

So. 2d 1197, 1203 (Fla. 1980) (quoting *Delno v. Mkt. St. Ry. Co.*, 124 F.2d 965, 967 (9th Cir. 1942)).  Here, we cannot say that.

In reviewing the trial court's refusal to discharge defense counsel and appoint a new one, we are mindful "that an indigent defendant has no right to choose a particular court-appointed attorney."  *Weaver v. State*, 894 So. 2d 178, 187 (Fla. 2004).  Thus, "if a trial court decides that court-appointed counsel is providing adequate representation, the court does not violate an indigent defendant's Sixth Amendment rights if it requires him to keep the original court-appointed lawyer or represent himself."  *Id.* at 188.  This makes sense given the "essential aim" of the Assistance of Counsel Clause of the Sixth Amendment, which is "to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  *Wheat v. United States*, 486 U.S. 153, 159 (1988).

In past cases we have concluded that a "lack of communication is not a ground for an incompetency claim."  *Morrison v. State*, 818 So. 2d 432, 440-41 (Fla. 2002); *see, e.g.*, *Glover v. State*, 226 So. 3d 795, 807-08 (Fla. 2017); *Davis v. State*, 136 So. 3d 1169, 1209 (Fla. 2014); *Guardado*, 965 So. 2d at 115.

- 23 -

We also have rejected claims based on a defendant's "displeasure with counsel's refusal to provide copies of legal documents and efforts in contacting witnesses," and a defendant's "complaints about his attorney's trial preparation, witness development, and trial strategy." *Morrison*, 818 So. 2d at 441; *see Sexton v. State*, 775 So. 2d 923, 930-31 (Fla. 2000). It is also our settled law that generalized grievances concerning these issues do not provide cause for a *Nelson*[14] hearing. *See, e.g., Morrison*, 818 So. 2d at 441; *Guardado*, 965 So. 2d at 115.

Here, Figueroa-Sanabria's concerns with Hammond boil down to two issues: a lack of communication and a lack of progress in preparing for trial. Neither supplies a basis for the relief he seeks. The trial court convened multiple *Nelson* hearings to consider Figueroa-Sanabria's grievances. The court inquired into Hammond's ability to handle the case and Hammond's stated

---

14. *Nelson v. State*, 274 So. 2d 256, 258 (Fla. 4th DCA 1973) ("[W]here a defendant, before the commencement of trial, makes it appear to the trial judge that he desires to discharge his court appointed counsel, the trial judge, in order to protect the indigent's right to effective counsel, should make an inquiry of the defendant as to the reason for the request to discharge.").

- 24 -

concerns about his relationship with Figueroa-Sanabria. We find the court conducted "sufficient inquiry to determine whether there was reasonable cause to believe that counsel was not rendering effective assistance." *Morrison*, 818 So. 2d at 442.

The court also continually tracked Hammond's progress on a list prepared by Figueroa-Sanabria enumerating issues he wanted addressed before trial. And, throughout trial, the court repeatedly asked Figueroa-Sanabria if he had any questions or concerns that could be addressed; not once during these colloquies did Figueroa-Sanabria object to Hammond's preparation or representation.

On the record before us, we cannot say the trial court inadequately addressed Figueroa-Sanabria's concerns; to the contrary, the three separate judges who considered Figueroa-Sanabria's motions each reasonably concluded that he failed to assert a sufficient basis for replacing Hammond. Figueroa-Sanabria has therefore failed to show that the court abused its discretion in denying his motions to substitute counsel, and he is not entitled to a new guilt phase on this basis.

**2**

Figueroa-Sanabria next argues that the trial court reversibly erred when it refused to exclude historical CSLI obtained without a warrant. First, however, we must decide whether this question is preserved for our review.

We have stated that "no magic words are required to make a proper objection." *Aills v. Boemi*, 29 So. 3d 1105, 1109 (Fla. 2010). An issue is preserved when it is "timely raised before, and ruled on by, the trial court" and was in its presentation "sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor." § 924.051(1)(b), Fla. Stat. The argument on appeal "must be the specific contention asserted as legal ground for the objection, exception, or motion below." *Steinhorst v. State*, 412 So. 2d 332, 338 (Fla. 1982).

In a hearing after the first day of jury selection, Figueroa-Sanabria questioned the legality of the State's warrantless acquisition of historical CSLI given the U.S. Supreme Court's decision in *Carpenter*, 138 S. Ct. at 2217, which, in Figueroa-Sanabria's words, provided that the State "need[ed] a search warrant for cellular call logs, towers, and everything." The court

told Figueroa-Sanabria that if the State could not show that it went through the procedural steps required to obtain the historical CSLI and Figueroa-Sanabria was convicted, then the acquisition of the historical CSLI would "certainly be part of the appellate issues that [he] would be contesting."[15]

While this interaction cannot be said to have conclusively and clearly preserved the issue for our review, Figueroa-Sanabria did put "the trial judge on notice that error may have been committed," *Castor v. State*, 365 So. 2d 701, 703 (Fla. 1978), and we decline, on these facts, to penalize Figueroa-Sanabria for proceeding in accordance with the trial judge's statement about the preservation of the issue for appeal. We thus proceed on the assumption that this issue was preserved.

Next, while we normally would address whether the State's acquisition of Figueroa-Sanabria's historical CSLI was a warrantless

---

15. The court also said that "if a mistake was made . . . then certainly your appellate lawyer will look into it because Mr. Hammond has preserved that for appeal." Hammond did file a motion to suppress, which was denied, but that motion only sought to suppress evidence garnered from Figueroa-Sanabria's cell phone before the acquisition of a warrant, not the historical CSLI.

Fourth Amendment search, and if so, whether the exclusionary rule applies, we need not reach these issues to resolve this case. That is because the allegedly erroneous introduction of the CSLI evidence is harmless.[16]

A trial court's error in admitting evidence obtained from an unconstitutional search is subject to harmless error analysis. *Smallwood v. State*, 113 So. 3d 724, 739 (Fla. 2013); *see* § 924.33, Fla. Stat. "The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable

---

16. When the State acquires evidence as the result of a constitutionally unreasonable search, the exclusionary rule may bar its admission. The exclusionary rule is a prudential doctrine created by the U.S. Supreme Court to "compel respect for the constitutional guaranty" found in the Fourth Amendment, *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)), by deterring "deliberate police misconduct," *Rodriguez v. State*, 187 So. 3d 841, 845 (Fla. 2015). The U.S. Supreme Court, however, has provided that the exclusionary rule does not apply when "the police conduct a search in objectively reasonable reliance on binding appellate precedent." *Davis*, 564 U.S. at 249-50. Although we do not reach the applicability of the good-faith exception, we note that, when the State acquired the historical CSLI in this case, binding precedent provided that the acquisition of such data was not a "search" under the Fourth Amendment—meaning a warrant was not constitutionally required. *See Mitchell v. State*, 25 So. 3d 632, 635 (Fla. 4th DCA 2009); *Johnson v. State*, 110 So. 3d 954, 958 (Fla. 4th DCA 2013).

doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). The test is focused "on the effect of the error on the trier-of-fact" and is not a "sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test." *Id.* at 1139.

Although the CSLI evidence is indeed inculpatory and was a part of the State's case, after "an examination of the entire record . . . including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict," *id.* at 1135, we conclude the State has met its burden here. The CSLI evidence "was merely cumulative." *Odom v. State*, 403 So. 2d 936, 940 (Fla. 1981).

We start with the other evidence inculpating Figueroa-Sanabria. It is "clearly conclusive." *DiGuilio*, 491 So. 2d at 1138. The State presented evidence that the two victims died on their houseboat after suffering multiple stab wounds, and that jewelry

valued at over $80,000 was stolen from the houseboat. There were no signs of a forced entry, and it was established that Figueroa-Sanabria was often given a key to the houseboat. Figueroa-Sanabria's DNA was present on both a roll and wad of duct tape left at the scene. Testimony revealed that the duct tape used to restrain the victims came from this roll. Both victims' DNA was found on discarded clothes that Cooper identified as Figueroa-Sanabria's, and Travlos's DNA was found on the carpet of the front passenger seat of the van in which Figueroa-Sanabria sat in the hours after the murders. Cooper recalled seeing Figueroa-Sanabria holding a knife that morning as they drove around with a backpack full of the victims' jewelry—some of which Figueroa-Sanabria sold before mailing the rest to his brother.

What is more, Figueroa-Sanabria elected to take the stand. When a defendant testifies on his version of events, the jury is "free to reject [his] version of events as unreasonable," *Finney v. State*, 660 So. 2d 674, 680 (Fla. 1995), and in turn may view this testimony as "evidence of a guilty mind." *Jackson v. State*, 347 So. 3d 292, 307 (Fla. 2022); *see also United States v. Allison*, 908 F.2d 1531, 1535 (11th Cir. 1990) ("The jury may view defendant's false

explanatory statement as substantive evidence proving guilt."). Figueroa-Sanabria testified that he received the jewelry from Cooper. This contradicted what he told investigators, which was that he had owned the jewelry for a while. Figueroa-Sanabria also did not explain why his DNA was left at the scene, why Cooper's DNA was not, and why Cooper would murder Travlos and Morin only to give Figueroa-Sanabria the jewelry. The jury was free to reject Figueroa-Sanabria's version of the events in light of all this, and it did.

As for the allegedly impermissible evidence, the jury heard from an intelligence analyst who, with Figueroa-Sanabria's historical CSLI, placed Figueroa-Sanabria's cell phone at a location south of the couple's apartment when he called Cooper early on the morning of the 12th. The State used this evidence to argue that Figueroa-Sanabria was near the houseboat at the time of the crimes and to rebut his argument that Cooper was the one who committed the crimes. But there "was additional substantial, reliable and admissible evidence" on both these points, *Hayward v. State*, 24 So. 3d 17, 34 (Fla. 2009), *as revised on denial of reh'g* (Dec. 10, 2009), including the DNA evidence that placed Figueroa-Sanabria, not

Cooper, at the scene rather than in its vicinity.[17] This supports the conclusion that the admission of the historical CSLI was harmless. *See Hojan v. State*, 3 So. 3d 1204, 1210 (Fla. 2009) ("This Court has held that where the evidence introduced in error was not the only evidence on the issue to which the improper evidence related, the introduction can be harmless.").

Our conclusion about the harmlessness of any error regarding the admission of Figueroa-Sanabria's historical CSLI evidence finds ample support in our cases. For example, in *Jeffries v. State*, we concluded that the trial court erred in admitting the defendant's shoes seized after an illegal arrest. 797 So. 2d 573, 577 (Fla. 2001). The jury learned that a shoe print at the crime scene was left by the same type of shoes as the defendant's. *Id.* at 579. Even with this connection, we concluded that the trial court's error was harmless. *Id.* The expert that testified at trial was unable to conclusively determine that the shoe print was made by the defendant's shoes.

---

17. The historical CSLI for Cooper's phone placed it in a sector that included both the apartment and the marina. Thus, while it does support Cooper's testimony, it also does not completely rule out Figueroa-Sanabria's version of events.

*Id.* And the State presented other, more inculpatory evidence: testimony from the defendant's siblings, who overheard the defendant talk about his plans to commit the crimes, expert testimony linking the defendant to a fingerprint left at the scene, and a stipulation from both parties that the defendant pawned the victim's jewelry shortly after the murder. *Id.* at 578-79.

In another case, *Saavedra v. State*, we had to determine whether a trial court had erred in denying the defendant's motion to suppress evidence obtained from his home after the police entered without a warrant and arrested him. 622 So. 2d 952, 956 (Fla. 1993). While we found that the police officers' initial entry into the home was not supported by third-party consent, we did not proceed to determine whether exigent circumstances were present to support the entry, or if the defendant's subsequent consent to search was tainted by his warrantless arrest. *Id.* at 959. Instead, we assumed officers had entered without exigent circumstances and that the later consent was tainted, and we proceeded to conduct a harmless error review. *Id.* We found the trial court's error to be harmless, even though the search led to the recovery of two pairs of black pants and a hood, which is what the defendants

- 33 -

allegedly wore when they sexually assaulted the victim. *Id.* at 955. This was because the verdict was strongly supported by the victim's in-court identification of both defendants as her attackers, and other testimony that both corroborated the victim's testimony about her injuries and tied the semen found on the victim's body to both defendants. *Id.* at 959.

As in these cases, here, too, the State is correct that there is no reasonable possibility that the allegedly erroneous admission of the evidence at issue contributed to the convictions. *See DiGuilio*, 491 So. 2d at 1135. Figueroa-Sanabria is therefore not entitled to a new guilt phase because of the trial court's admission of the historical CSLI.

**3**

Even when the defendant does not contest the sufficiency of the evidence at trial, we have "an independent obligation to review the record for sufficiency of the evidence." *Blake v. State*, 972 So. 2d 839, 850 (Fla. 2007). "[T]he concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and

- 34 -

judgment." *Tibbs v. State*, 397 So. 2d 1120, 1123 (Fla. 1981).

Important to this case, a "general guilty verdict rendered by a jury

instructed on both first-degree murder alternatives may be upheld

on appeal where the evidence is sufficient to establish either felony

murder or premeditation." *Crain v. State*, 894 So. 2d 59, 73 (Fla.

2004).[18]

The jury heard sufficient evidence of Figueroa-Sanabria's guilt:

the absence of forced entry on the houseboat and his frequent

possession of a key to it; the DNA evidence on the duct tape at the

crime scene and on his clothes; the knife on his lap and stolen

jewelry in his backpack; his statement to investigators about how

long he had the jewelry, which conflicted with his own later

testimony; and the cumulative falsehood of that testimony, which

_____

18.  The three elements of premeditated first-degree murder
are: (1) the victim is dead; (2) the death was caused by the criminal
act of the defendant; and (3) there was a premeditated killing of the
victim.  *See* Fla. Std. Jury Instr. (Crim.) 7.2; § 782.04(1)(a)1., Fla.
Stat.  The three elements of felony murder as it pertains to this case
are: (1) the victim is dead; (2) while engaged in the commission of a
robbery and/or burglary, the defendant caused the death of the
victim; and (3) the defendant was the person who actually killed the
victim.  *See* Fla. Std. Jury Instr. (Crim.) 7.3; § 782.04(1)(a)2., Fla.
Stat.

the jury chose to reject. We conclude that "a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt," *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001), and thus affirm Figueroa-Sanabria's convictions.

**B**

We now turn to the penalty phase. While Figueroa-Sanabria asserts that the trial court committed multiple errors during this phase, we need reach only one. The trial court's erroneous acceptance of Figueroa-Sanabria's invalid waiver of his right to the assistance of counsel, and counsel's subsequent absence for nearly the entire penalty phase, entitles Figueroa-Sanabria to a new penalty phase.

**1**

The parties disagree about whether Figueroa-Sanabria needed to preserve his argument concerning the trial court's acceptance of his waiver and counsel's subsequent absence. If an issue is preserved, we apply either the harmless error test or per se reversible error rule,[19] *Johnson v. State*, 53 So. 3d 1003, 1007 (Fla.

---

19. Again, an error is harmless if "there is no reasonable possibility that the error contributed to the conviction." *DiGuilio*,

2010), *as revised on denial of reh'g* (Jan. 27, 2011), and if it is not, we review only for fundamental error, *F.B. v. State*, 852 So. 2d 226, 229 (Fla. 2003). Here, though, because we conclude that the deprivation of counsel constitutes fundamental error, we need not answer the preservation question, as Figueroa-Sanabria is entitled to a new penalty phase whether or not he properly preserved this issue.

**2**

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Amend. VI, U.S. Const. The U.S. Supreme Court has interpreted the Sixth Amendment to secure the right to appointed counsel for a defendant in federal court, *Johnson v. Zerbst*, 304 U.S. 458, 462-63 (1938), and the Fourteenth Amendment to extend this right to state criminal proceedings, *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).[20] The right to appointed counsel applies in the penalty

---

491 So. 2d at 1135. An error is per se reversible if it is "so basic to a fair trial" that it "can never be treated as harmless error." *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)).

20. In *Traylor v. State*, we concluded that sections 2 and 16 of article I of the Florida Constitution combined to produce the

- 37 -

phase.  *See Muehleman v. State*, 3 So. 3d 1149, 1156-57 (Fla. 2009); *Harris v. Dugger*, 874 F.2d 756, 762 (11th Cir. 1989).

Even if defendants exercise this right to appointed counsel, "all competent defendants have a right to control their own destinies."  *Hamblen v. State*, 527 So. 2d 800, 804 (Fla. 1988); *see Martinez v. Court of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152, 165 (2000) (Scalia, J., concurring in judgment) ("Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State.").  This means that "[b]y exercising his constitutional right to the *assistance* of counsel, a defendant does not relinquish his right to set the parameters of that representation."  *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992).

In line with this principle, our case law "affords competent capital defendants 'great control over the objectives and content of

---

constitutional right to appointed counsel.  596 So. 2d 957, 969 (Fla. 1992).  This right extends to each crucial stage, which is "any stage that may significantly affect the outcome of the proceedings."  *Id.* at 968.  In most cases, indigent defendants are also entitled to counsel by statute.  *See* § 27.40, Fla. Stat.; § 27.51, Fla. Stat.

[their] mitigation.'" *Bell v. State*, 336 So. 3d 211, 217 (Fla. 2022) (alteration in original) (quoting *Boyd v. State*, 910 So. 2d 167, 189 (Fla. 2005)). Therefore, "regardless of '[w]hether [the] defendant is represented by counsel or is proceeding pro se, the defendant has the right to choose what evidence, if any, the defense will present during the penalty phase.'" *Id.* (alterations in original) (quoting *Boyd*, 910 So. 2d at 189-90); *see also Hojan*, 3 So. 3d at 1211; *Farr v. State*, 656 So. 2d 448, 449 (Fla. 1995). Put plainly, "a defendant cannot be forced to present mitigating evidence during the penalty phase of the trial." *Grim v. State*, 841 So. 2d 455, 461 (Fla. 2003).

Here, however, the trial court informed Figueroa-Sanabria that "if [Hernandez] represents [Figueroa-Sanabria], he's going to present mitigation on [his] behalf," effectively telling Figueroa-Sanabria that his right to the assistance of counsel was conditioned on the presentation of mitigation. Faced with this choice, one he should not have been forced to make, Figueroa-Sanabria decided to proceed pro se.

The trial court's statements call into question Figueroa-Sanabria's knowing, intelligent, and voluntary waiver of his right to the assistance of counsel during the penalty phase. "[W]aivers of

- 39 -

counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (emphasis omitted). Additionally, "[t]here must be both the capacity to make an understanding choice and an absence of subverting factors so that the choice is clearly free and responsible." *Von Moltke v. Gillies*, 332 U.S. 708, 729 (1948) (Frankfurter, J., separate opinion). And "courts generally will indulge every reasonable presumption against waiver of this fundamental right." *Traylor*, 596 So. 2d at 968.[21]

---

21. The U.S. Supreme Court has said that, as a matter of federal constitutional law, "it [is] incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.'" *Brewer v. Williams*, 430 U.S. 387, 404 (1977) (quoting *Zerbst*, 304 U.S. at 464). Thus, on "direct appeal, the government bears the burden of proving the validity of the waiver." *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995). We have said that the State bears the burden of proving the validity of a defendant's waiver in a variety of circumstances, including the waiver of the right to counsel if a defendant confesses after the

Here, we cannot say that Figueroa-Sanabria knowingly and voluntarily waived his right to counsel for the penalty phase of his trial. While a "criminal defendant may be asked, in the interest of orderly procedures, to choose between waiver and another course of action as long as the choice presented to him is not constitutionally offensive," *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976), it was unconstitutional for the trial court to misinform Figueroa-Sanabria as to the nature of his rights and put him to the specific choice he faced: have a lawyer present mitigation, or go it alone. *See Mora v. State*, 814 So. 2d 322 (Fla. 2002) (concluding that the trial court committed reversible error by requiring a defendant to choose between the right to counsel and the right to forgo mitigation investigation); *Wilson v. State*, 12 So. 3d 292 (Fla. 4th

---

administration of warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See, e.g., Ramirez v. State*, 739 So. 2d 568, 575 (Fla. 1999). "Where a defendant, without counsel, acquiesces in a trial resulting in his conviction and later seeks release by the extraordinary remedy of habeas corpus, the burden of proof rests upon him to establish that he did not competently and intelligently waive his constitutional right to assistance of Counsel." *Zerbst*, 304 U.S. at 468-69; *see also Mason v. State*, 176 So. 2d 76, 78-79 (Fla. 1965) (imposing burden on a postconviction petitioner to establish an insufficient waiver of counsel).

- 41 -

DCA 2009) (same, as to requiring defendant to choose between the right to counsel and the right to testify); *Turner v. State*, 851 So. 2d 276 (Fla. 4th DCA 2003) (same, as to requiring defendant to choose between testifying against his will and the court declaring a mistrial). We cannot say under these circumstances that Figueroa-Sanabria's waiver was knowing, intelligent, and voluntary, meaning the trial court erred in accepting it.

The trial court's repeated inquiries throughout the penalty phase as to Figueroa-Sanabria's desire to remain without counsel did not cure this error. Even though Figueroa-Sanabria refused to reinstate counsel each time the trial court asked, he did so almost assuredly because he remained under the impression that reinstating counsel would mean the presentation of mitigation evidence. Consider Figueroa-Sanabria's response when the trial court asked whether he wanted Hernandez reinstated so that Hernandez could offer advice on the verdict form: he said, "[t]hat would not interfere in my—" and the trial court responded, "[i]t wouldn't change the mitigation issue, no."

In sum, a defendant's choice about whether to waive the right to present all mitigating evidence "is not altered when the defendant

has counsel." *Boyd*, 910 So. 2d at 189.  The trial court's statement of the law to the contrary, which prompted Figueroa-Sanabria to waive his right to counsel, means we cannot conclude that Figueroa-Sanabria's waiver was knowing, intelligent, and voluntary.

**3**

Fundamental errors are few and rare.  *Smith v. State*, 521 So. 2d 106, 108 (Fla. 1988).  We have said they are those that "permeate or saturate the trial with such basic invalidity as to lead to a reversal regardless of a timely objection," *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960), and go to "the foundation of the case or the merits of the cause of action and [are] equivalent to a denial of due process," *J.B. v. State*, 705 So. 2d 1376, 1378 (Fla. 1998).

Figueroa-Sanabria has established that the error here—which left him without the assistance of counsel for the majority of a penalty phase proceeding in a death penalty case on the basis of a waiver that was not knowing, intelligent, and voluntary—qualifies as fundamental.  "Florida courts, including this Court, have found deprivations of counsel to be fundamental error."  *Jackson v. State*, 983 So. 2d 562, 575 (Fla. 2008).  Such cases "generally involve deprivation of counsel during an entire proceeding."  *Id.*  For

- 43 -

example, in *Gonzalez v. State*, 838 So. 2d 1242, 1243 (Fla. 1st DCA 2003), the First District Court of Appeal found that the complete denial of counsel at resentencing constituted a fundamental error, and we approved that decision. *See Jackson*, 983 So. 2d at 575.

Other examples from Florida cases include the complete deprivation of counsel during both a juvenile plea hearing and a disposition hearing, *State v. B.P.*, 810 So. 2d 918 (Fla. 2002); *State v. T.G.*, 800 So. 2d 204 (Fla. 2001), a juvenile plea hearing, *J.R.V. v. State*, 715 So. 2d 1135 (Fla. 5th DCA 1998), a violation of probation hearing, *Brady v. State*, 910 So. 2d 388 (Fla. 2d DCA 2005), and a violation of community control hearing, *Tyler v. State*, 710 So. 2d 645 (Fla. 4th DCA 1998).

In certain cases involving only a partial deprivation of a defendant's right to the assistance of counsel, Florida courts have applied our familiar harmless error analysis[22] or found no fundamental error. *See, e.g., Jackson*, 983 So. 2d at 577 (finding

---

22. Because "fundamental error is not subject to harmless error review," *Reed v. State*, 837 So. 2d 366, 369-70 (Fla. 2002), these are all cases in which the absence of counsel did not constitute fundamental error.

no fundamental error when defense counsel was absent for part of a victim impact statement); *Thompson v. State*, 507 So. 2d 1074 (Fla. 1987) (reviewing for harmless error when defendant was deprived of counsel during a thirty-minute recess); *Vileenor v. State*, 500 So. 2d 713 (Fla. 4th DCA 1987) (reviewing for harmless error when defense counsel was absent for five minutes after the trial court started reading the jury instructions); *Wilson v. State*, 764 So. 2d 813 (Fla. 4th DCA 2000) (reviewing for harmless error when defendant did not have the assistance of counsel when the jury asked a question during deliberations).

But here, Figueroa-Sanabria's defense counsel was not absent for a brief time or during only part of the victim impact testimony. Counsel was discharged before the penalty phase began, only to be reinstated when the jury had questions about the verdict form during deliberations, meaning Figueroa-Sanabria was without the assistance of counsel for nearly all of the penalty phase in front of the jury. Figueroa-Sanabria has demonstrated that this deprivation "affected—and contaminated—the entire criminal proceeding" thereafter, *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988), and is in

that sense like others we have found to constitute fundamental error.

Even if we assume Hernandez could not have presented mitigation evidence, his presence could have bolstered Figueroa-Sanabria's penalty-phase defense in multiple ways. For one, Hernandez could have provided an opening statement, which allows an attorney to outline what he "expects to be established by the evidence." *Occhicone v. State*, 570 So. 2d 902, 904 (Fla. 1990). He might have cross-examined and impeached the State's witness, thus requiring the State's case in aggravation "to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). He could have provided closing argument. Given that "one of the most important functions of the capital sentencing process is the opportunity to humanize the defendant, the importance of the defense's closing argument cannot . . . be overstated." *Lawhorn v. Allen*, 519 F.3d 1272, 1296 (11th Cir. 2008). Closing argument by the defense "can remind the factfinder of favorable facts that it may have forgotten or mistakenly downplayed or prematurely misjudged." *Id.* And it allows defense counsel to show "the meaning and value of the defendant's life and

worthiness to live." *Id.* (quoting *Marshall v. Hendricks*, 307 F.3d 36, 99, 103 (3d Cir. 2002) (internal quotation marks omitted)). Here, about to enter deliberations, the jury heard only from the State, which urged it to conclude that Figueroa-Sanabria was "among the worst of the worst," and that "the death of those two people on that boat, that night, warrant that [Figueroa-Sanabria] pay with his."

"[L]awyers in criminal courts are necessities, not luxuries." *Gideon*, 372 U.S. at 344. "The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done." *Zerbst*, 304 U.S. at 462 (internal quotation marks omitted). The presence and assistance of counsel, one of these constitutional safeguards, is paramount, as it affects a defendant's ability to "assert any other rights he may have." *Cronic*, 466 U.S. at 654 (quoting Walter V. Schaefer, *Federalism and State Criminal Procedure*, 70 Harv. L. Rev. 1, 8 (1956)). Here, because of the trial court's misstatement of the law, Figueroa-Sanabria stood alone during opening statements, the State's presentation of aggravating evidence, and closing arguments. This means that Figueroa-Sanabria was without the assistance to which he was constitutionally entitled. While the

"doctrine of fundamental error should be applied only in rare cases," *Smith*, 521 So. 2d at 108, Figueroa-Sanabria has established that he is entitled to a new penalty phase.

## III

We affirm Figueroa-Sanabria's convictions for the first-degree murders of John Travlos and Germana Morin. We set aside his sentences of death and remand for new penalty phase proceedings.

It is so ordered.

MUÑIZ, C.J., and CANADY, GROSSHANS, and FRANCIS, JJ., concur.
FRANCIS, J., concurs with an opinion.
LABARGA, J., concurs in result.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

FRANCIS, J., concurring.

I agree with the majority that Mr. Figueroa-Sanabria is entitled to a new sentencing hearing based on the trial court's fundamental error in forcing him to abandon counsel during the penalty phase. That said, I write separately to reject Mr. Figueroa-Sanabria's claim that the State violated his Fourth Amendment rights under *Carpenter v. State*, 228 So. 3d 535 (Fla. 2017), when it obtained Mr.

Figueroa-Sanabria's historical cell site location information (CSLI) via subpoena. As explained below, because *Carpenter* distorts the proper application of the exclusionary rule, I urge abandoning the decision's misguided overreach in rejecting binding United States Supreme Court precedent. By overruling *Carpenter*, this Court would rightly relieve the unconstitutional burden on the State to forecast the "settledness" of Fourth Amendment law and conform our precedent to that of the U.S. Supreme Court, as mandated by the Florida Constitution.

While investigating Mr. Figueroa-Sanabria as the prime suspect in the 2013 murders of John Travlos and Germana Morin, the State obtained Mr. Figueroa-Sanabria's CSLI data via subpoena. This data revealed that Mr. Figueroa-Sanabria's cellphone was within the area of the marina during the time the victims were murdered.[23] When the State filed the subpoena to obtain Mr.

_____

23. The historical CSLI also demonstrated that Mr. Figueroa-Sanabria's girlfriend, whom he accused of committing the murders, was likely within the area of their apartment north of the marina but pinged the tower closer to the apartment. By contrast, Mr. Figueroa-Sanabria's CSLI data revealed that he was within range of the marina and his northern apartment, but his phone pinged the

Figueroa-Sanabria's CSLI data, two opinions from the Fourth District Court of Appeal established that the Fourth Amendment did not require the State to seek a warrant for CSLI. *See Mitchell v. State*, 25 So. 3d 632 (Fla. 4th DCA 2009); *Johnson v. State*, 110 So. 3d 954 (Fla. 4th DCA 2013). Therefore, the State complied with binding precedent permitting their request at the time.[24]

Still, the State would be punished for a lack of prophetic ability. By the time the State brought the case to trial six years later, their search of Mr. Figueroa-Sanabria's cell phone data hit a legal landmine: this Court's 2017 *Carpenter* decision. Running with Justice Sotomayor's concurring opinion in *Davis v. United States*, 564 U.S. 229, 250-52 (2011) (Sotomayor, J., concurring), the *Carpenter* decision addressed the question of whether the police could reasonably rely on binding appellate court precedent when that precedent was "unsettled" when the search occurred. *Carpenter,* 228 So. 3d at 541-42. In her opinion, Justice Sotomayor

---

southmost tower, making it more likely that he was closer to the marina after the murders.

24. Neither case was certified for review by this Court when the search was conducted.

cautioned that the *Davis* decision did not resolve this question.

*Davis*, 564 U.S. at 252 (Sotomayor, J., concurring) ("[W]hether

exclusion would result in appreciable deterrence in the

circumstances of this case is a different question from whether

exclusion would appreciably deter Fourth Amendment violations

when the governing law is unsettled. The Court's answer to the

former question in this case thus does not resolve the latter one.").

The *Carpenter* Court tasked itself with resolving that allegedly open

question and held the State *must* seek a warrant if the precedent

disclaiming the need for one was "unsettled." *Carpenter*, 228 So. 3d

at 541-42.

Extending this newfangled principle, the *Carpenter* Court

disagreed that the good-faith exception applied to the warrantless

search of a cellphone incident to arrest, despite binding Florida

appellate court precedent authorizing that practice at the time of

said search. *Id.*[25] Relying on that decision and the U.S. Supreme

---

25. The *Carpenter* Court seemingly limited its decision's scope
by claiming that the officers should not have relied on a case in the
pipeline for review at this Court. *See Carpenter*, 228 So. 3d at 541
("The First District's certified question to this Court only furthers
the notion that the officers in Carpenter's case should not have
relied on *Smallwood* [*v. State*, 61 So. 3d 448 (Fla. 1st DCA 2011)]

Court's holding in its 2018 *Carpenter* case, *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (holding that the State must obtain a warrant to access a suspect's historical CSLI data), Mr. Figueroa-Sanabria claims his CSLI data evidence should have been excluded because of the change in the law. *Id.* In effect, Mr. Figueroa-Sanabria claims the State should have known not to rely on two binding appellate decisions authorizing a non-warrant request for CSLI data at the time of the search because the law was "unsettled" when the search was done.

But this Court's *Carpenter* opinion improperly relied on Justice Sotomayor's concurring opinion in *Davis*. Rather than rely on the concurrence's attempt to limit the majority opinion's

---

as being the final controlling judicial precedent in this area of constitutional law while the case was certified to this Court for final decision."). But there is no principled grounding for that limitation, which is why Mr. Figueroa-Sanabria can raise a colorable argument here. *Id.* ("The 'conscientious police work' discussed in *Davis* requires that officers not engage in warrantless searches unless <u>clearly authorized</u> by law . . . . Thus, if the law on a particular issue is still developing, it is not reasonable for officers to rely on questionable decisions in pipeline cases to justify warrantless searches . . . ."). Justice Sotomayor identified no such limitation on the "unsettledness" of a precedent in her concurrence. In any event, *Carpenter* should be rejected regardless of the decision's intended scope.

applicability, the *Carpenter* Court should have applied the *Davis*

**majority** opinion's reasoning. The majority there announced a

different rule than the one the *Carpenter* Court employed: "Evidence

obtained during a search conducted in reasonable reliance on

binding precedent is not subject to the exclusionary rule." *Davis*,

564 U.S. at 241; *see also Carpenter*, 228 So. 3d at 544 (Lawson, J.,

dissenting) ("There is simply no way that reliance on binding legal

precedent—whether well-settled or not—can be cast as police

misconduct, much less 'flagrant' police misconduct."). The *Davis*

majority reasoned that the proper balance between deterring police

misconduct and the hefty cost inflicted by the exclusionary rule was

to apply the good-faith exception when the police rely on binding

precedent:

> About all that exclusion would deter in this case is
> conscientious police work. Responsible law enforcement
> officers will take care to learn what is required of them
> under Fourth Amendment precedent and will conform
> their conduct to these rules. But by the same token,
> when binding appellate precedent specifically *authorizes*
> a particular police practice, well-trained officers will and
> should use that tool to fulfill their crime-detection and
> public-safety responsibilities. An officer who conducts a
> search in reliance on binding appellate precedent does no
> more than act as a reasonable officer would and should
> act under the circumstances. The deterrent effect of

exclusion in such a case can only be to discourage the officer from doing his duty.

That is not the kind of deterrence the exclusionary rule seeks to foster. We have stated before, and we reaffirm today, that the harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity. Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

*Davis*, 564 U.S. at 241 (internal citations and quotation marks omitted).

Yet even in the face of the *Davis* majority opinion's holding that reliance on precedent constitutes good-faith for purposes of the exception, the *Carpenter* Court and Mr. Figueroa-Sanabria argue that his historical CSLI must be excluded. Instead of following the *Davis* decision, Mr. Figueroa-Sanabria and the *Carpenter* decision demand that the State question binding authority and act as a kind of constitutional spiritual medium, using some presupposed clairvoyance to determine the future "settledness" of the law out of the ether. *See generally Carpenter*, 228 So. 3d at 541-42. Rather than foisting this unwieldy burden of prophecy on law enforcement, the U.S. Supreme Court correctly concluded that suppressing evidence in this context diverges from the foundation and principles of the exclusionary rule. *Davis*, 564 U.S. at 241 ("An officer who

- 54 -

conducts a search in reliance on binding appellate precedent does no more than " 'ac[t] as a reasonable officer would and should act' under the circumstances.") (alteration in original).  We should do so as well.

Compounding this constitutional error, the *Carpenter* Court ignored limitations on our discretion in the text of the Florida Constitution.  Under the conformity clause, "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures" is to "be construed ***in conformity*** with the 4th Amendment to the United States Constitution, ***as interpreted by the United States Supreme Court.***"  Art. I, § 12, Fla. Const. (emphasis added).[26]  By ignoring

_____

26.  Notably, the conformity clause of article one, section twelve was adopted in part to bring Florida's exclusionary rule jurisprudence in line with the federal good-faith exception. William A. Buzzett & Deborah K. Kearney, *Commentary to 1982 Amendment,* 25A, Fla. Stat. Ann., art. I, § 12, Fla. Const. (2020).  ("In response, the governor, attorney general, state prosecutors, and the law enforcement community supported a joint resolution in the 1982 Regular Session, which would have engrossed a good faith exception onto the constitutional exclusionary rule."); *see Carpenter,* 228 So. 3d at 543 n.3 (Lawson, J., dissenting) ("The commentary to the 1982 amendment states that the amendment was necessary to modify the exclusionary rule [in Florida] and to allow adherence by the Florida courts to the good faith exception adopted by the federal courts.") (alteration in original) (quoting

this clause—as Justice Lawson correctly argued in his dissent—the *Carpenter* Court exercised discretion it did not have to reject the *Davis* majority's application of the good-faith exception. *See Carpenter*, 228 So. 3d at 542-45 (Lawson, J., dissenting) ("Clearly, we are bound by the United States Supreme Court's Fourth Amendment jurisprudence, including the majority opinion in *Davis v. United States*."). Though our Court might find an alternative interpretation of the Fourth Amendment alluring, we cannot shrug off the strictures of binding constitutional provisions when it suits us. *See Soca v. State*, 673 So. 2d 24, 27 (Fla. 1996). "[W]e are bound to follow the interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide to Florida citizens no greater protection than those interpretations." *Id.*

As a result of these choices, the *Carpenter* Court created a gulf between our precedent and the *Davis* majority opinion that muddies the waters of the good-faith exception and violates the conformity clause. When the State is considering whether they must seek a

---

*Crain v. State*, 914 So. 2d 1015, 1022-23 (Fla. 5th DCA 2005) (en banc)).

warrant, prosecutors and the police should not have to scry a crystal ball, consult a Ouija board, or conduct a group tarot card reading to intuit the law's metaphysical finality before making their choice. Hanging this burden of prophecy around the State's neck fails to accomplish the goals or purposes of the exclusionary rule as explained in the *Davis* majority opinion. And as Justice Lawson explained then, *Carpenter* flouts the Florida Constitution by disregarding the conformity clause. Because the decision was both misguided and unconstitutional, I urge overruling *Carpenter* and bringing our precedent in line with the United States and Florida Constitutions.

An Appeal from the Circuit Court in and for Pinellas County,
     Pat Siracusa, Judge – Case No. 522013CF006490XXXXNO

Howard L. "Rex" Dimmig, II, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

     for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Timothy A. Freeland, Assistant Attorney General, Tampa, Florida,

     for Appellee